Judith McRoberts TODD, Individually and as Executrix of the Estate of George W. Todd, III, Deceased, and Judith McRoberts Todd, as mother and next friend of George W. Todd, IV, et al., Plaintiffs,

v.

UNITED STATES of America, Defendant.

No. 69–286–Civ–J.

United States District Court, M. D. Florida, Jacksonville Division.

Aug. 30, 1974.

As Amended Jan. 13, 1975.

MacLean & Brooke, Jacksonville, Fla., Banner & McIntosh, Wichita Falls, Tex., Grissett & Humphries, Jacksonville, Fla., for plaintiffs.

Robert R. Smiley, III, Dept. of Justice, Washington, D. C., and Mark A. Dombroff, Federal Aviation Administration, for defendant.

## MEMORANDUM OPINION

TJOFLAT, District Judge.

This case is a survival and wrongful death action resulting from the death of plaintiffs' decedent, George W. Todd, in an aircraft accident which occurred November 21, 1967 when the aircraft which Todd was piloting struck Cheaha Mountain in the State of Alabama. The action is based upon the alleged negligence of an agency of the United States, the Federal Aviation Administration, and its employees. A claim was timely filed with the appropriate federal agency and final administration was taken thereon. This suit was filed within six months thereafter, giving this Court jurisdiction of the matter under the Federal Tort Claims Act, Title 28, United States Code, Section 1346(b) and Sections 2671 et seq. Since the plaintiff was a resident of Jacksonville, Florida at the time of her husband's death, and still resides there, venue is correctly laid in this Court. 28 U.S.C. § 1402(b). This case was tried before the Court without a jury on the issue of liability only, and based upon the evidence at trial and the record in this case the Court makes the following findings of fact and reaches the following conclusions of law.

On the date of the accident George Todd was a duly qualified and licensed pilot holding a valid FAA Commercial Pilot's Certificate with a multi-engine instrument rating. He was an experienced pilot, thoroughly familiar with the airplane he was flying. The aircraft was a Piper PA–30, a twin engine aircraft equipped with radio aids to navigation, which enabled the pilot to determine the position of the aircraft with relation to any of a number of FAA-operated transmitting stations (VOR's), and Distance Measuring Equipment (DME) from which the pilot could determine his distance, in nautical miles, from any VOR station having a DME transmitter. The aircraft did not have an autopilot. Todd had on board the aircraft a Jeppeson flight case containing a Low Altitude Enroute Chart (Appendix A) of the area in which the

flight in question was to be made, and a compendium of instrument approach plates or charts, including a plate for Anniston, Alabama. He did not have on board a Sectional Chart, published by the United States Department of Commerce, for the Birmingham, Alabama area (Appendix B), which indicates terrain features.

On the morning of November 21, Todd filed an Instrument Flight Rule (IFR) flight plan by telephone to the Jacksonville Service Station with a destination of Ashland, Alabama. Mrs. Florence Verkeller, an employee of the Federal Aviation Agency, briefed Todd on the weather he might expect to encounter en route and in the vicinity of his final destination. The weather en route and in the vicinity of the destination varied from VFR (Visual Flight Rule) to IFR, but in no instance did it fall below IFR minima.

George Todd took off alone in N–8124–Y from Craig Field in Jacksonville, Florida at 8:30 A.M. Eastern Standard Time (EST) under VFR conditions. Shortly after take-off he contacted the Jacksonville Departure Radar Controller and was issued an IFR clearance to the Ashland Airport, via the route he had requested, at an elevation of 5000 feet. At 8:40 A.M. he received clearance to climb to and maintain 6000 feet, and shortly thereafter reported reaching that altitude. En route from Jacksonville to Ashland he operated the aircraft without unusual incident, using proper radio technique and channel selection, staying on his predetermined route. At 9:20 Todd passed from the area served by the Jacksonville Air Traffic Control Center to the Atlanta Center, and he established radio contact with that facility. Todd requested and received numerous weather reports as he flew toward his destination, all indicating various degrees of cloudiness and rainshowers. At 10:04 Todd, who was proceeding outbound from the La Grange, Georgia, VOR on a 290 degree radial, was cleared to descend to 5000 feet. He acknowledged the clearance, advised that he was leaving 6000 and requested still lower altitude. The Atlanta Center thereupon cleared him to descend to 4000 feet. Todd acknowledged the clearance and reported leaving 5000 for 4000. At approximately 10:05 the Center asked Todd whether he was still flying on instruments or in instrument conditions. Todd replied that he was in visual conditions, with three to four miles visibility, and requested further descent. The Center advised that his radar service was terminated and he should contact Anniston Radio for further clearance. At this time liaison between Atlanta Center and Birmingham Approach Control had been accomplished and the control of 8124Y was "handed off" to Birmingham Approach Control, which controlled the Ashland-Anniston-Talladega area at lower altitudes. The pilot was in direct communication with the Anniston Flight Service Station, which in turn communicated with Birmingham by interphone to obtain any clearances. At 10:15 Birmingham Approach Control cleared 8124Y for an approach to the Ashland airport and advised the Anniston Flight Service Station that if he was unable to land he should hold east of the Anniston 150° radial on the La Grange 290°, to maintain 4000 feet and advise of his situation. At 10:38 Todd reported Ashland in sight and cancelled his IFR flight plan. Todd circled the field at an elevation of 800–1000 feet but decided that he would not land, apparently due to lack of visibility, which was at that time approximately one mile in light rain. At 10:44 Todd reported that he was unable to land at Ashland and was presently at 2500 feet. He requested an approach to Anniston. Without determining the position of the aircraft Birmingham issued a clearance at 10:44:24 for "approach to Anniston Airport Cruise at four thousand." The word "cruise" in a clearance indicates to the pilot that climb to or descent from the indicated altitude may be made at the pilot's discretion, as opposed to a "maintain" clearance which requires the pilot to

maintain the designated altitude until reaching a certain point or receiving other instructions. At 10:48 Todd requested a change in destination from Anniston to Talladega and the following exchange took place between the Anniston Flight Service Station and Birmingham Approach Control:

10:48:06 ANB This Eight One Two Four Yankee?

10:48:08 VHM AD Yeah

10:48:08 ANB All right, he's decided he wants to land Talladega now.

10:48:11 BHM AD Uh, he's getting in everybody's hair, ain't he!

10:48:12 NAB He sure is!

10:48:13 BHM AD Well, let's see, Talladega, where's that? Lee Merkle?

10:48:15 ANB No, No, No! It'd be Anniston VOR, Eastabogie

10:48:18 BHM AD Eastaboga, or yeah, that's right, ok, he's cleared for an approach Talla, Talladega Airport

10:48:23 ANB Ok, J M

10:48:24 BHM AD Cruise Four, J. W.

·As a result of this exchange the Anniston Flight Service Station relayed the following clearance to Todd: "ATC clears N8124Y for an approach at the Talladega Airport, cruise at 4000 feet." At 10:53 Todd asked the Anniston Flight Service Station how long he was required to maintain 4000 feet on a cruise clearance. The Flight Service Station replied that on a cruise clearance a pilot could commence descent at his own discretion. At that time Todd reported leaving 4000 feet. This was the last contact between ATC and 8124Y. At approximately 11:00 Todd contacted the Talladega fixed base operator and inquired about the weather. There was no reply to the operator's response and it must be concluded that it was about this time when Todd collided with the Cheaha Mountain, 8 nautical miles north of the Ashland Airport and 14 nautical miles south-southeast of the Talladega

Airport within the confines of the V-66 airway, at an elevation of about 2100 feet. The aircraft hit the ground in a wings-level descending attitude, on a heading which was carrying it directly toward the Talladega VOR. George Todd was killed instantly, and the aircraft was completely destroyed by fire.

Plaintiffs and defendant each assert negligence on the other's part on numerous grounds. Plaintiffs first assert that the absence of "letters of agreement" between the Birmingham installation and Atlanta Center is negligence as a matter of law. Internal regulations promulgated by the Federal Aviation Agency provide in pertinent part that:

> Facility chiefs shall negotiate with other facilities or appropriate non-FAA authorities and issue letters of Agreement when it is necessary to . . . [d]efine inter-facility or inter-agency responsibilities and coordination requirements. . . .

The following are examples of appropriate subjects for Letters of Agreement:

A. Between centers
 1. Radar handoff procedures
 2. Inter-facility coordination procedures
 3. Delegation of control jurisdiction

B. Between a center and a tower:
 1. Terminal area control service
 2. Inter-facility coordination procedures
 3. Tower/Center en route control service

C. Between towers:
 1. Tower en route control service
 2. Inter-facility coordination procedures

FAA Facility Operation Manual, §§ 331.1, 331.2

Prior to trial plaintiffs requested production of "the letter of agreement or

similar document governing tower-to-tower low altitude procedures engaged in by the Birmingham tower as of 11/21/67." The United States responded that "the letters of agreement cannot be produced since no letters of agreement covering *tower-to-tower* procedures between Birmingham and approach control Anniston Flight service station or Atlanta service center were in existence at the time of the accident." (Emphasis added.) Plaintiffs now argue that the United States was negligent as a matter of law for failure to have the "required" letters of agreement between Atlanta Center and Birmingham Approach Control. Although the Court is not anxious to condone the extremely technical approach taken by the United States in the discovery of this matter, it is apparent that plaintiff failed to recognize the distinction between the tower-to-tower letters of agreement and center-to-center or center-to-tower letters of Agreement. On the state of the record developed by plaintiffs it is clear that this Court cannot make a finding that no letters of agreement existed between the Atlanta and Birmingham facilities, or that any violation of those letters occurred. The plaintiffs' own expert witness, Francis M. McDermott, testified that the transcripts of radio transmissions clearly show "that there is a division of responsibility between the Atlanta Center and the Birmingham Approach Control facility, and this could only be provided by a letter of agreement." It is further the conclusion of this Court that there was no showing that any lack of coordination between the Atlanta and Birmingham facilities was a proximate cause of the crash in question.

The plaintiffs contend that the FAA was negligent in that the Victor 66 Airway, within the confines of which 8124Y crashed, had a Minimum Enroute Altitude (MEA) and Minimum Obstruction Clearance Altitude (MOCA) of only 4000 feet when Federal Air Regulations (FAR) [1] required a higher terrain clearance altitude. It seems clear that a pilot, flying under IFR, could reasonably rely upon the fact that "unless otherwise authorized by the Administrator" the altitudes prescribed for the airway in question would not be in violation of the minimum altitude regulations. The evidence at trial failed to show any reasonable means by which George Todd should have known that the Victor 66 Airway fell within any exception to FAR 91.119. The government introduced at trial Federal Aviation Administration Circular 95.1 which was promulgated in June of 1965 and in force at the time of the crash in 1967. While the authority of this document for altering the rules established by FAR 91.119 and 95 might be somewhat unclear, it is clear that at the time of the crash of 8124Y the information had not been made available to airmen by any of the methods of dissemination provided in the Airman's Information Manual.[2] In fact, Advisory Circular 95.1 was not officially adopted in an FAA handbook until July 1, 1970. It is the conclusion of this Court that the altitude requirements for the Victor 66 Airway were in violation of the applicable regulations and an airman had no reasonable means

---

1. The Ashland-Anniston-Talladega area falls within the Eastern United States Mountainous Area designated by Part 95 of the Federal Aviation Regulations. 14 C.F.R. § 95.-13 (1967). The regulations provide under "Minimum altitudes of IFR operations" that Except when necessary for takeoff or landing, or unless otherwise authorized by the administrator, no person may operate an aircraft under the IFR below . . .
 (I)n the case of operations over an area designated as a mountainous area in Part 95 an altitude of 2,000 feet above the highest obstacle within a horizontal distance of five statute miles from the course to be flown; . . . 14 C.F.R. § 91.119(a) (1967).

2. The manual provides that:
 Aeronautical information concerning the National Air Space System is disseminated by three methods. The primary method is aeronautical charts. The second method is the Airman's Information Manual (AIM) and the third is the National Notice to Airmen System. . . .

of being aware of the "exception" created by Advisory Circular 95–1. However, in assessing the factual situation in this case, it is the conclusion of this Court that George Todd could not in fact have been relying upon any 2000 foot maximum obstruction altitude which the airway MEA might have implied. The aircraft crashed while on a wings-level, *descending* altitude at approximately 2100 feet in altitude, some 14 miles southeast of his final destination at Talladega. It is inconceivable to this Court that George Todd would have been only one hundred feet above the obstruction altitude and descending while he was still within the confines of the Victor 66 Airway and some 15 miles from his destination. It is the conclusion of this Court that Geroge Todd either did not know where he was or was unaware of the altitude of the terrain in the area and the enroute obstruction clearance altitudes of the Victor 66 airway. In either case it cannot be said that any negligence or violation of regulations in prescribing altitudes for the Victor 66 airway was a proximate cause of the crash.

Plaintiffs allege that the weather report given to George Todd by the Anniston Flight Service Station at approximately 10:45 A.M. contained a material omission which amounted to negligence on the part of the United States. It has been stipulated that the weather reported to George Todd at that time was as follows:

A scattered layer of clouds 800 feet, another scattered layer at 2000 feet, an overcast layer at 6000 feet, visibility 1½ miles in light rain and fog, temperature 44, dew point 43, the wind from 040 degrees magnetic at 5 knots, altimeter setting 30.05, and the visibility to the south was reported as one mile.

Plaintiffs contend that the omission of the statement "ridges obscured in all quadrants" which was contained in the Anniston surface weather observations earlier and later in the day on November 21, 1967, was negligent and a proximate cause of the crash. The evidence at trial was clear that ridges in the area of Cheaha Mountain in particular were obscured the entire morning of November 21st. However, at approximately 9:35 A.M., and again at 9:42 A.M., Todd had been given the following Anniston weather by the Macon, Georgia, Flight Service Station:

A scattered layer of clouds at 2000 feet, an overcast layer of clouds at 6000 feet, visibility 1 mile in rain and fog, temperature 43, dew point 42, wind from 010 degrees magnetic at 4 knots, thunder began at 30 minutes after the hour (8:30 A.M.) and ended at 50 minutes past the hour (8:50 A. M.), the thunderstorm moved east, and that ridges were obscured in all quadrants.

Between 9:45 and 10:45 Todd received numerous reports of weather at other points in the area; all indicated moderate to heavy rainshowers, some thunderstorms and turbulence.

■ It is clear the government has a duty, in circumstances such as these, to exercise due care in providing current weather information and weather forecasts to the pilot. Gill v. United States, 429 F.2d 1072 (5th Cir. 1970); Ingham v. Eastern Air Lines, 373 F.2d 227 (2d Cir. 1967).

■ However, it is the opinion of this Court that in the light of the totality of the circumstances surrounding the weather communication in question, the omission of the words "ridges obscured in all quadrants" was not a material omission and did not constitute negligence on the part of the United States. George Todd had on at least two occasions received weather forecasts for the Anniston area stating that ridges were obscured in all quadrants, and the allegedly negligent 10:45 report showed no real improvement in the weather picture for the area. The information provided was accurate and a pilot in the normal exercise of due care should have known the altitude of the surrounding terrain

and the fact that the layers of clouds as reported would be obscuring the higher terrain.

The Court now turns to the difficult issue of the clearances given by Air Traffic Control (ATC) in handling the flight of 8124Y after the pilot determined that he was unable to land at Ashland. Both parties and the Court agree that from the standpoint of clearances by the ATC personnel, this case "begins" at the time the pilot reported that he was unable to land in Ashland and requested clearance to Anniston. A further question which was much debated at trial is the Air Traffic Controller's duty to warn the pilot of 8124Y of the possible obstruction to his flight path presented by Cheaha Mountain. In the Court's view these two issues are highly interdependent and must be considered together. For example, had the ATC given the pilot a "maintain 6000" clearance which would have required him to clear by several thousand feet any possible obstruction, clearly no duty to warn would exist. The Court must determine under the facts of this case first whether the clearances given constituted negligence in themselves, and, second, whether in light of the clearances given and communications received from the pilot any duty of ATC to warn of possible obstructions arose.

In a very thorough consideration of the standards of duty imposed upon the pilot and ATC the United States Court of Appeals for the Fifth Circuit in American Airlines, Inc. v. United States, 418 F.2d 180 (5th Cir. 1969) set forth the following:

1. The pilot is in command of the aircraft, is directly responsible for its operation, and has final authority as to its operation.

2. Before a pilot can be held legally responsible for the movement of his aircraft he must know, or be held to have known, these facts which were then material to its safe operation. Certainly the pilot is charged with that knowledge which in the exercise of the highest degree of care he should have known.

3. The air traffic controller must give the warnings specified by the manuals.

4. The air traffic controller, whether or not required by the manuals, must warn of dangers reasonably apparent to him. 418 F.2d at 193, 197.

To these this Court would add a fifth requirement appropriate to the issues of this case:

5. Determined by the facts of the particular case, due care requires an air traffic controller to issue clearances in accordance with the FAA manuals, and over and beyond the requirements of the manuals the clearances issued must be reasonably designed to insure the safety of aircraft flight.

Plaintiffs first contend that FAA trainee John Whitfield, who was manning the arrival data position at Birmingham and issued the clearances following Todd's inability to land at Ashland, was not qualified or authorized to issue the clearances in question in violation of paragraph 261.1A, FAA Handbook 7230.1, Facility Operations Manual:

A specialist shall be assigned to the responsibility of an operating position or sector only if he is currently qualified.

The radio transcripts introduced at trial demonstrate that trainee Whitfield had an inadequate knowledge of the local terrain and airports, and had to be monitored and prompted by others while at the arrival data position. It is clear from the evidence that trainee Whitfield was not properly certified to control air traffic in accordance with 14 C.F.R. § 65, Subpart B. Evidence presented at trial as to what degree of supervision, if any, was exercised over trainee Whitfield was insufficient to allow this Court to make any finding in this regard. In this Court's view, the paramount issue is

whether the clearances actually given were negligent. Negligence in this respect would obviously have a greater causative effect than remote conduct relating to the controller's qualifications and the supervision afforded him.

■ It is the opinion of this Court that the "cruise 4000" clearances given 8124Y without determining the plane's position and under highly adverse weather conditions over terrain designated as mountainous was negligence on the part of the United States. It is clear that 14 C.F.R. §§ 91.119 and 95, although not directed to air traffic controllers, envision IFR flights being operated at an altitude of at least 2000 feet above the highest obstacle in the path of the airplane except when *necessary* for takeoff and landing. It is clear that the lower altitude clearance, only some 1,000 feet above the highest potential obstacle (the tower on Cheaha Mountain), with discretion to descend from that altitude was not necessary, and expert testimony introduced at trial was to the effect that the plane should have been required to maintain an altitude of at least 5,000 feet until it had cleared the high terrain and reached the navigational aids at the Anniston or Talladega airports, then descending to land. The ATC in effect opened a new IFR flight plan for 8124Y after his earlier flight plan was closed without knowing the location or "point of departure" of the aircraft in violation of 14 C.F.R. § 91.83. It is further the opinion of this Court that, even absent the application of the above regulations, the clearances given to 8124Y were negligent in that as a matter of good aviation practice they were not reasonably designed to insure the safety of the aircraft's flight. Plaintiffs point out that, at the time the cruise clearances were given and particularly after Todd's communication to the Anniston Flight Service Station that he was leaving 4000 feet, it should have been reasonably apparent to the ATC that Cheaha Mountain, the highest terrain in the entire area and obscured by weather, was in the vicinity of 8124Y, and that the pilot

could not safely descend at his discretion. Though the presence of the terrain and the potential danger it presented should have been equally obvious to Todd in the exercise of due care, ATC nevertheless had a duty to warn Todd, under the fourth standard of duty as set forth in American Airlines, supra, that he was in the vicinity of Cheaha Mountain and a descent might prove dangerous. Failure to issue this warning constituted negligence on the part of the United States.

■ Plaintiffs also contend that the response of the Anniston Flight Service Station attendant to George Todd's inquiry as to how long he was required to maintain 4000 feet on a cruise clearance constituted "controlling air traffic" in violation of FAA Manual 7300.7, Aeronautical Communications and Pilot Services, paragraph 171.2, which specifically states to flight service station operators: "Do not control air traffic." The flight service station, merely answering a request for the meaning of a clearance by giving the definition contained in the Airman's Information Manual, is not controlling air traffic, but merely issuing advisory information at the pilot's request. Although the particular information involved here is not specifically authorized by the manual in question, it is not prohibited and was clearly a reasonable action by the Anniston Flight Service Station.

■ As to Todd's actions in piloting the aircraft, defendant asserts numerous grounds of contributory negligence. The law is clear that:

> The pilot in command of an aircraft is directly responsible for, and is the final authority as to, the operation of the aircraft. 14 C.F.R. § 91.3; American Airlines, Inc. v. United States, supra.

The duties of a pilot do not cease merely because clearance from the tower has been received. See, e. g., United States v. Miller, 303 F.2d 703 (9th Cir. 1962); United States v. Schultetus, 277 F.2d 322 (5th Cir. 1960).

The United States asserts that George Todd was intoxicated at the time of the crash of 8124Y in violation of 14 C.F.R. 91.11, which provided at that time that:

(a) No person may act as a crew member of a civil aircraft—
(1) Under the influence of intoxicating liquor. . . .

This assertion is primarily based upon blood samples with an alcohol level of .11, allegedly taken from George Todd's body after the crash. The evidence showed that two test tubes, each four to six cc's in size and completely full, with no air space, were transferred from the refrigerator of the physician performing the autopsy through three Alabama State Troopers, one of whom took the samples home over a weekend and put it in the family icebox. For some inexplicable reason the blood samples were not tested until nearly two months after arrival at the toxicology laboratory, and they were delivered in two test tubes ten cc's in size with considerable air space. The entire chain of custody is so replete with gaps and unexplained circumstances that this Court does not consider the evidence of intoxication to be of any probative value. The evidence also showed that George Todd manifested no signs of intoxication in his flight of 8124Y on the day in question.

The evidence at trial showed that George Todd in filing his IFR flight plan failed to list alternate destinations and that he did not have a sectional chart of the Birmingham area aboard his aircraft. Defendant asserts that these two omissions were negligence on his part. The omission of an alternate destination in the IFR flight plan was a violation of 14 C.F.R. § 91.83 dealing with information required for a flight plan, but such omission in and of itself was clearly not a proximate cause of the crash. Todd's failure to have a sectional chart on board was not a violation of Federal Air Regulations which require that:

"Each pilot in command shall, before beginning a flight, familiarize himself with all available information concerning that flight. . . . 14 C.F.R. § 91.5"

FAA Handbook, 8260.19, Flight Procedures and Air Space, at page 51, states:

207. Aeronautical Charts and Publications

(a) Aeronautical charts used for air navigation are generally of two groups, VFR charts and IFR charts. The VFR charts are the sectional and local aeronautical charts and the visual navigation charts. IFR charts are the Enroute Low and High Altitude Charts and Instrument Approach Procedure Charts.

The fact that Todd, on an IFR flight plan, did not have on board a sectional chart for the Birmingham area was not a violation of FAA regulations and was not in itself negligence, although expert testimony at trial indicated that it was good practice to have such a chart on an IFR flight.

The United States contends that the pilot's descent from 4000 feet while still within the boundaries of the Victor 66 Airway which had a 4000 foot enroute and obstruction clearance altitude was in violation of 14 C.F.R. § 91.119(a). It is the opinion of this Court that descent from 4000 feet to 2100 feet while still some 15 miles from the destination was not "necessary for landing" within the meaning of the exception to the minimum altitude requirements, constituted negligence, and contributed to the cause of the crash. Todd's conduct cannot be justified by arguing either that the ATC cruise clearance authorized an avoidance of this regulation, or that the ATC failed to warn him of the danger of a descent in the vicinity of Cheaha Mountain. The clearance simply granted him a measure of discretion to be exercised in accordance with standards of due care and applicable regulations. In addition, despite the ATC's failure to warn of the possible danger of a descent in the vicinity of Cheaha

Mountain, had Todd been exercising proper care in his flight, as required by the second standard set out in American Airlines, supra, he would have been aware of this potential hazard and would not have descended from the 4000 foot cruise clearance.

 On the evidence as a whole the Court reaches two further conclusions: On his approach to Talladega Todd either recklessly commenced descent with little or no visibility in known mountainous terrain or, through a lack of preflight preparation, found it necessary blindly to descend in unfamiliar surroundings without any communication of his predicament to ATC. In either case, Todd's conduct constituted negligence and a proximate cause of the crash. His failure to plan alternate destinations and to carry a sectional chart, although not sufficient in and of themselves to constitute negligence, evidences the lack of preparation.

Todd was flying into a small airport in mountainous terrain under adverse weather conditions. His actions in descending to such a low altitude, even though technically permissible under a cruise clearance, indicated a lack of knowledge of, or indifference to, the elevation of the terrain which could not be excused. Failure to familiarize himself with the terrain features of the area, if that was the case, was a negligent violation of FAA regulations requiring a pilot to obtain such information.

 The incident which took George Todd's life occurred in Alabama, as did all acts or omissions of employees of the United States which are alleged to have caused it. Thus the substantive law of Alabama becomes the law of this case. Richards v. United States, 369 U. S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962); American Airlines, Inc. v. United States, 418 F.2d 180 (5th Cir. 1969). Federal Air Regulations duly published in accordance with law in the Code of Federal Regulations have the force of law. United States v. Schultetus, 277 F.2d 322 (5th Cir. 1960). Under Alabama law violation of such regulations amounts to negligence per se. Robbins

v. Voigt, 280 Ala. 207, 191 So.2d 212 (1966); Sims v. Greniewicki, 43 Ala. App. 159, 184 So.2d 157 (1966). Contributory negligence is a complete defense to a claim of simple negligence, but is no defense if willful or wanton negligence is proved. Louisville & N. R. Co. v. Watson, 90 Ala. 68, 8 So. 249 (1890). Under Alabama case law the requisite willfulness requires the "conscious doing of some act or omission of some duty under knowledge of the existing conditions and conscious that from the doing of such act or omission of such duty injury will likely or probably result." Lankford v. Mong, 283 Ala. 24, 214 So.2d 301 (Ala.1968). Such a degree of negligence cannot be attributed to the United States under the facts of this case. In this unfortunate occurrence the United States' employees and the pilot of 8124Y were concurrently negligent, and the negligence of each was a proximate cause. Under the substantive law of the State of Alabama plaintiff takes nothing by this action, and Final Judgment shall be entered in favor of the United States.