686 F.2d 178
 11 Fed. R. Evid. Serv. 1115
 Joan B. REDHEAD, Individually and as Co-Executrix of the
Estate of Hugh McCulloch Redhead, Deceased, and the National
Bank of Detroit, Co-Executor of the Estate of Hugh McCulloch
Redhead, Deceased, Appellants,
v.
UNITED STATES of America, Appellee.
 No. 81-2625.
 United States Court of Appeals,
Third Circuit.
 Argued April 26, 1982.
Decided Aug. 6, 1982.
 
 Laidler B. Mackall (argued), Loren Kieve, Steptoe & Johnson, Washington, D. C., Mark A. Rosenblum, Houston, Cohen, Harbaugh & Lippard, Pittsburgh, Pa., for appellants.
 J. Paul McGrath, Asst. Atty. Gen., Gary W. Allen, Asst. Director (argued), Torts Branch, Civ. Div., U. S. Dept. of Justice, Washington, D. C., J. Alan Johnson, U. S. Atty., Pittsburgh, Pa., for appellee.
 Before ALDISERT, WEIS and BECKER, Circuit Judges.
 OPINION OF THE COURT
 WEIS, Circuit Judge.
 
 
 1
 Plaintiffs sued the government under the Federal Tort Claims Act, 28 U.S.C. § 2671 et seq., alleging that an airplane crash was caused by the negligence of an air traffic controller in failing to direct the pilot of the plane to proceed to a safe altitude rather than allowing him to attempt a landing under marginal weather conditions. The district court held that, under the circumstances, the controller was entitled to assume the pilot was in command of the situation and was operating the aircraft in accordance with Federal Aviation Administration regulations. Accordingly, judgment was entered for the defendant. We will affirm.
 
 
 2
 The complaint in the district court alleged that their decedent, Hugh Redhead, was killed in the crash and that the government was liable in damages. After a bench trial, the district judge absolved the government of negligence.
 
 
 3
 Plaintiffs' decedent was a passenger in a private plane that crashed into Sugarloaf Mountain near Nemacolin, Pennsylvania, on September 12, 1975, killing the pilot, co-pilot and the two passengers. The aircraft was a twin-engine turboprop equipped with radio navigational equipment, including that necessary for travel under instrument flight rules (IFR).[1] The pilot and co-pilot were well qualified, each having more than forty-eight hundred hours of flight time. Both had flown into the Nemacolin Airport on two occasions before the accident.
 
 
 4
 The plane left the Pittsburgh Airport at 11:38 a. m. for its destination at Nemacolin, a short distance away. According to the briefing the crew received before takeoff, the weather was generally poor, although improving, with low ceilings and low visibility within the area of the five weather reporting stations closest to Nemacolin.
 
 
 5
 The Nemacolin Airport is uncontrolled and does not have an FAA-approved instrument approach procedure. The ground elevation at the airport is 2,000 feet above sea level and the surrounding mountainous area has peaks of 2,900 feet.
 
 
 6
 After leaving the Pittsburgh airport, the plane flew under instrument flight rules and was in radar contact with an air controller located in Cleveland, Ohio. Approximately nine minutes after takeoff, the crew requested and received a cruise clearance of 5,000 feet mean sea level, telling the controller, "we'll take a look at Nemacolin and, ah, let you know."
 
 
 7
 A cruise clearance is not discretionary; it must be issued by an air controller upon request. The cruise clearance authorized the plane to fly at 5,000 feet and would permit the pilot to descend below that altitude to land only if visual flight rule conditions prevailed. FAA regulations provide that once a cruise clearance is granted, the pilot reserves a block of air space up to the limit specified in the clearance. Once the pilot "reports" leaving that altitude in the block, he may not return to it without air traffic controller clearance.
 
 
 8
 Immediately after the air controller granted the cruise clearance, an army helicopter reported that it could not see plaintiffs' plane, which was then about eight miles away. A minute later the controller told the helicopter that the plane was now at 4,100 feet on a cruise clearance, and they were about three miles apart.
 
 
 9
 At 11:55, three minutes after the cruise clearance had been granted, the decedent's aircraft descended to approximately 3,400 feet. As the air traffic controller observed this on the altitude data block on his radar screen, he radioed the pilot "what are your intentions?" The crew replied, "We just tak'n a look (W)e're getting some ground contact here, and I think we're gonna make it. But, uh, just standby with us, and, uh, we'll give you a call here in a minute." A few seconds later one of the crew told the controller "if we, uh, we lose radio contact with you and we make the AP, the landing ok, I've got an eight hundred number to call to cancel it (the flight plan)." The plane continued its gradual descent until 11:56 when it leveled off at about 2,600 feet. Two minutes later the controller lost radar contact with the plane. The next day the plane was found; it had crashed into the hillside at approximately 2,600 feet above sea level.
 
 
 10
 According to FAA regulations, an air traffic controller is required to issue a "low altitude alert" to radar-identified aircraft if, in the judgment of the controller, radar shows the aircraft to be in an unsafe proximity to terrain or obstructions. However, information about the terrain is not displayed on the radar screen, nor does it indicate most weather conditions or whether the pilot is flying under instrument or visual flight rules.
 
 
 11
 The trial court found that the controller was not required to affirmatively solicit weather information from the plaintiffs' plane to determine if it was flying in visual flight conditions. Since the plane had left its assigned 5,000 feet altitude, and the crew knew that they could not descend unless they were in visual flight circumstances, the controller was entitled to assume that the aircraft was operating under VFR. The descent was normal and the transmissions from the crew were made in a calm manner, not indicating any anxiety or fear. The pilot did not "report" his change of altitude and, therefore, was free to return to 5,000 feet without prior permission.
 
 
 12
 The radio message that they were getting some ground contact was found by the court to be an indication that the crew was able to glimpse the ground through occasional breaks in the clouds. There was no finding whether there was sufficient visibility to operate under visual flight rules.
 
 
 13
 The trial court concluded that because the plane's flight path did not exhibit any significant or extreme deviations from what normally would be expected during a descent, the controller did not have a duty to issue a low altitude alert. The controller was aware that the region was mountainous, but that fact would not have prevented a safe landing in VFR conditions, which the controller reasonably expected was the situation in this case. The court concluded that there was no negligence on the part of the controller.
 
 
 14
 Plaintiffs appeal on the grounds that the controller was not entitled to assume that the crew was obeying the regulations at the time of the descent, so that he was negligent as a matter of law in not soliciting a weather report from the plane and for not issuing a low altitude alert. Plaintiffs also allege trial court error in the refusal to receive deposition testimony of the controller, denial of an amendment to the complaint, and allowance of certain hypothetical questions.
 
 
 15
 Both the pilot and the air traffic controller owe a duty of care to passengers in an airplane. Negligence by the pilot does not, in and of itself, absolve the government of liability. Each is responsible for the safe conduct of the aircraft and the safety of its passengers. See Rudelson v. United States, 602 F.2d 1326 (9th Cir. 1979); Dickens v. United States, 545 F.2d 886 (5th Cir. 1977); Spaulding v. United States, 455 F.2d 222 (9th Cir. 1972). Thus, there may be concurrent liability.
 
 
 16
 The pilot is in command of the aircraft, is directly responsible for its operation, and has final authority as to its operation. In re Air Crash Disaster at New Orleans (Moisant Field), 544 F.2d 270 (6th Cir. 1976). He must be aware of those facts which are material to its proper operation and is charged with that which he should have known in the exercise of the highest degree of care. American Airlines, Inc. v. United States, 418 F.2d 180 (5th Cir. 1969).
 
 
 17
 Tower personnel and air traffic controllers are often a source of vital information. If there is negligence on the part of such persons, it must have a causal relationship to the happening of the accident-in other words, their conduct must be a proximate cause. DePriest v. Kooiman, 379 Mich. 44, 149 N.W.2d 449 (1967).[2]
 
 
 18
 In this case, as in most negligence litigation, factual issues predominate. While the nature and extent of the duty of due care is a question of law, in reviewing the district court's decision we are bound to sustain the factual findings unless they are clearly erroneous. Rudelson v. United States, 602 F.2d at 1329.
 
 
 19
 Plaintiffs' theory of liability essentially is that either by soliciting weather information from other pilots or by interrogating the crew of the aircraft, the controller should have learned what the conditions were in the precise area where the plane was descending. With that knowledge, plaintiffs argue, the controller would or should have ordered the pilot to return to or remain at the safe 5,000 feet altitude.
 
 
 20
 The record does not support plaintiffs' contention. As the district court found, the fact that the weather in the general area was poor did not preclude the possibility of better conditions at a particular location, which would permit a pilot to use visual flight rules. Plaintiffs did not identify any sources, other than the decedent's plane, through which the controller could determine precise weather conditions in that immediate area. The controller testified that he did not have weather information at his disposal, other than the report of poor visibility by the army helicopter that was flying in the same general area as decedent.
 
 
 21
 The record shows that the weather conditions were caused by a slow-moving cold front which was traveling in a southeasterly direction through the area. The plane, flying in the same southeasterly direction, was therefore approaching the weather conditions from the backside, rather than heading directly into it. The crew reported getting some ground contact, indicating that there were breaks in the clouds rather than a solid overcast as the plane approached Nemacolin.
 
 
 22
 Plaintiffs' expert testified that this message would lead him to believe that the plane was not proceeding in compliance with visual flight regulations. The government's expert, an air traffic controller specialist, testified to the contrary that he would assume that the pilot was conducting the flight according to regulations in visual flight conditions and that he would "probably (be) breaking out underneath whatever weather that might have been there at the time and breaking (sic) down so that he could safely proceed to and land at his destination."
 
 
 23
 The controller who monitored the flight testified that "(t)he man seemed to be handling his craft well. His conversation indicated to me that he had everything under control. I had no reason to (give a low altitude alert) from where I was sitting." The controller said that he would not have expected the pilot to make the transmission about ground contact if he were in instrument flight conditions and, furthermore, that the pilot was required to contact the controller if he could not comply with the clearance.
 
 
 24
 Assessing the testimony of the witnesses in this case depends largely upon their credibility. Although the plaintiffs' expert was helpful to their cause, the controller and the government's experts made out a case of non-liability which persuaded the trial judge. In circumstances like these, the appellate court must extend great deference to the superior ability of the trial judge to determine where lies the believable evidence.
 
 
 25
 Plaintiffs contend that the controller should have solicited weather reports (PIREPS) from the decedent's plane and other pilots in the area, so as to become familiar with the situation at Nemacolin.[3] But there is nothing in the record to indicate that any such information would have been of value in the situation that existed here, since the weather was variable in specific locations. The people who were best informed about the weather at the critical area were the crew members of the plane. The controller had a right to assume that, in the absence of evidence to the contrary, conditions there were such that the aircraft could operate under visual flight rules. He could expect that out of concern for their own lives, if for no other reason, the crew members were flying in conformance with FAA regulations.
 
 
 26
 The pilot of an aircraft is in command of the flight. The controller, at some distant point, has the duty to aid and assist the crew and furnish whatever information he has that would be helpful. But decisions that depend upon conditions known in detail only by the pilot must be made by him. See Spaulding v. United States, 455 F.2d at 226-27; American Airlines, Inc. v. United States, supra.
 
 
 27
 The cases where the controller has superior knowledge of weather conditions are not applicable here. This was not an emergency situation or one where the controller failed to inform or warn the pilot of a sudden change in the weather. Martin v. United States, 586 F.2d 1206, 1209-10 (8th Cir. 1978); Delta Air Lines, Inc. v. United States, 561 F.2d 381, 397 (1st Cir. 1977), cert. denied, 434 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed.2d 764 (1978). See also Himmler v. United States, 474 F.Supp. 914, 923-26 (E.D.Pa.1979). In variable conditions such as existed here, the pilot could well have found visibility sufficient to land once he descended. See In re Air Crash Disaster at New Orleans (Moisant Field), 544 F.2d at 278.
 
 
 28
 The controller was in no better position to inform the pilot about the weather than the pilot was himself. It is not negligence not to repeat information already given or that is already known to the pilot. Spaulding v. United States, 455 F.2d at 227. When the pilot decided to go below 5,000 feet, he reserved the right to return to that altitude if he did not find adequate visual conditions to proceed. It is the pilot's duty to keep the visual flight minimums necessary for a visual approach landing, and if he encounters conditions below prescribed minimums, he must execute a missed approach. American Airlines, Inc. v. United States, 418 F.2d at 189-90.
 
 
 29
 In view of these general principles and the factual findings, which were not clearly erroneous, we cannot say that the trial judge erred as to the ultimate finding that negligence may be not ascribed to the government here.
 
 
 30
 Plaintiffs also contend that the trial judge erred in denying them permission to amend the complaint so as to charge the FAA with negligence in the supervision, training, and evaluation of air traffic controllers. The motion was denied at a pretrial conference, the judge noting that the proposed amendment would require reopening of discovery and would be unfair to the defendant. The case had been pending for some years and the plaintiffs had had ample opportunity to amend before pretrial. The trial judge did not abuse his discretion in denying the motion which would have delayed the projected trial date. Moreover, as the factual record demonstrates, the proffered amendment would not have served to establish the proximate cause of the crash in any event.
 
 
 31
 Plaintiffs also complain that the court erred in refusing to allow portions of the air controller's deposition taken during discovery to be read into evidence during trial. The judge pointed out that the controller was in the courtroom, available to testify in person. We find no error in the trial judge's ruling, since there were no unique procedural circumstances present which dictated that portions of the deposition be used instead of live testimony. If indeed there was any error, it was harmless because the controller testified in full about his part in the ill-fated flight.
 
 
 32
 Finally, plaintiffs argue that the trial judge erred in permitting the defense to pose hypothetical questions without proper record bases. If there was any error in the trial judge's rulings, it was harmless error at most.
 
 
 33
 There being no reversible error, we will affirm the judgment of the district court.
 
 
 34
 BECKER, Circuit Judge, dissenting.
 
 
 35
 The majority affirms primarily because it agrees with the district court that, on the facts of this case, the air traffic controller fully discharged his duty to the passengers by relying on the pilot to obey the visual flight rules. The majority acknowledges that pilots and controllers have concurrent duties of care, see Pierce v. United States, 679 F.2d 617 at 621-622 (6th Cir. 1982); Mattschei v. United States, 600 F.2d 205, 208 (9th Cir. 1979), but ignores that principle as it reviews the district court's findings of fact and conclusions of law. The majority asks whether the district court's findings are clearly erroneous and has no difficulty concluding that they are not, but never asks whether the district court applied an erroneous legal standard. I disagree then with the majority's approach to the question of the controller's negligence.[1] In my opinion, the district court's failure to apply, or even to recognize, the principle of concurrent duties of care led to clearly erroneous findings of fact. I would reverse on the ground that the controller had a duty to issue a low altitude alert to the plane which he did not discharge.[2]
 
 I.
 
 36
 The majority sets out most of the important facts in its opinion, but the record cannot be properly evaluated without a much fuller explanation of the governing standards of conduct than the majority gives. The majority states correctly that pilots and controllers "(e)ach (are) responsible for the safe conduct of the aircraft and the safety of its passengers," majority op., typescript at 182, but does not explore the meaning of concurrent duties of care, which are independent duties. Consequently, I must do so.
 
 
 37
 Pilots are the final authority over and bear ultimate responsibility for the operation of their aircraft, as the majority emphasizes, but the pilot's responsibility does not abrogate the controller's duty of care. The negligence of a pilot relieves a negligent controller of liability only if the pilot or the pilot's representative is the plaintiff and if contributory negligence is a complete defense. See Todd v. United States, 384 F.Supp. 1284, 1294 (M.D.Fla.1975), aff'd, 553 F.2d 384 (5th Cir. 1977) (per curiam); cf. Rudelson v. United States, 602 F.2d 1326, 1331-32 (9th Cir. 1979) (applying California law of comparative negligence). The negligence of a pilot is not imputed to his or her passengers. Pierce v. United States, supra, at 622. The controller's duty is to convey all information and give all warnings specified by Federal Aviation Administration manuals, and to "take steps beyond those set forth in the manuals if such steps are necessary to ensure the safety of pilots and passengers" in emergency or especially hazardous situations. Rudelson v. United States, supra, 602 F.2d at 1329. Accord, Hartz v. United States, 387 F.2d 870, 873-74 (5th Cir. 1968); Himmler v. United States, 474 F.Supp. 914, 931 (E.D.Pa.1979). A controller may have a duty to act even if the emergency arises from a pilot's failure to comply with FAA regulations. This obligation is made clear by the aviation cases already cited and by Michigan law, which applies to the decision of this case.[3] Under the Michigan "emergency doctrine," the controller is not required to anticipate pilot negligence but has a continuing duty to exercise reasonable care under the circumstances, which may require action when a reasonably prudent person would recognize impending danger. See DePriest v. Kooiman, 379 Mich. 44, 149 N.W.2d 449, 451 (1967) (per curiam) (duties of automobile driver with right of way); Noyce v. Ross, 360 Mich. 668, 104 N.W.2d 736, 741-42 (1960) (same).
 
 II.
 
 38
 In this suit by the estate of a passenger, the conduct of the pilot is at issue only as it relates to the information available to the controller while the plane descended toward Nemacolin Airport. Whether the controller was negligent ultimately depends on his right to assume that the pilot of the plane in which appellants' decedent was a passenger could see his path clearly as the plane descended. If the controller was entitled to make this assumption, it was because a reasonable person would not have known or suspected that the pilot was not obeying the visual flight rules ("VFR").[4] But if a reasonable person would have known or suspected differently, then the controller had a duty to warn the pilot that he was dangerously low by issuing a low altitude alert. For the reasons set out below, I conclude on the basis of the record that the controller did have this duty and that he is not absolved of responsibility by the pilot's apparent disregard of the rules for VFR flight.
 
 
 39
 The district court's contrary conclusion rests on an erroneous construction of the scope of a controller's duties. The district court held as a matter of law that the controller's duty was primarily to provide separation among aircraft; that he had no duty to inquire whether the plane was descending in VFR conditions; and that he had no duty to issue a low altitude alert at any time during the descent. App. at 3940, PP 5, 8-9. The district court made two critical findings of fact: a controller "is entitled to assume that a pilot is observing Federal Air Regulations,"[5] and the controller in this case was entitled to assume that the plane was descending under VFR conditions "because it descended and its crew would have known that they could not descend unless they were in VFR conditions according to Federal Air Regulations." Id. at 36-37, PP 71-72. The majority agrees with the district court, concluding that
 
 
 40
 (t)he controller had a right to assume that, in the absence of evidence to the contrary, conditions there were such that the aircraft could operate under visual flight rules. He could expect that out of concern for their own lives, if for no other reason, the crew members were flying in conformance with FAA regulations.
 
 
 41
 Majority op., typescript at 183.
 
 
 42
 The principles enunciated by the district court misstate the law. A controller is entitled to assume pilot adherence to the regulations only until he or she should know that the assumption is unwarranted; a controller has a continuing duty to exercise due care under the circumstances. See Rudelson v. United States, supra, 602 F.2d at 1329; Noyce v. Ross, supra, 104 N.W.2d at 741-42. The district court also misapprehended the law with respect to the controller's duty to issue low altitude alerts. Contrary to its conclusion that the controller's primary duty was to separate aircraft, the Controller's Manual instructs a controller to give "first priority" not only to separating aircraft but also to issuing low altitude alerts "to radar identified aircraft if an automatic altitude report is observed on radar showing the aircraft to be at an altitude, which in your judgment, places the aircraft in unsafe proximity to terrain/obstructions." Controller's Manual, supra note 4, at P 55 (as amended June 2, 1975). Discharge of this duty requires more than a judgment call:
 
 
 43
 (A)n awareness of significant or extreme deviations can, in respect to terrain and obstructions, be expected on a reasonable, though intermittent basis. In each case conditions of workload, impact of the volume of traffic, the quality/limitations of radar, etc., will be the basis along with the time or persistence of the deviation, for determining reasonableness ... (T)his paragraph does not impose a duty to see the development of such situations; it does require, however, that when such a situation is observed, the pilot be so advised.
 
 
 44
 Id. at P 55A. Even the Government's expert testified that, in the circumstances of this case, a controller would have a duty to issue a low altitude alert if he or she received information that a plane was not in VFR conditions. App. at 290.
 
 III.
 
 45
 Viewed in light of the proper standard of conduct, the record demonstrates that the district court's finding that the controller was entitled to assume that the plane was descending in VFR conditions was clearly erroneous. The controller should have known from the information available to him that the plane probably was not in VFR weather. Weather conditions within the area of the five weather stations closest to Nemacolin Airport were generally poor, with low ceilings and poor visibility. The radio transmissions to and from the controller, reproduced in the margin,[6] show that, five minutes before the crash, the pilot of an army helicopter three miles from the plane reported that he could not see the plane ("no joy") and that he was flying in instrument weather ("India Mike Charlie").[7] Less than two minutes later the radar screen data block[8] indicated that the plane had descended to 3,400 feet, and the controller asked the plane, "What are your intentions?" The pilot replied, "We just takin' a look, we're getting some ground contact here and I think we're gonna make it, but, uh, just stand by with us and, uh, we'll give you a call here in a minute." The controller testified that this reply told him that the plane was operating in VFR conditions "(b)ecause he left 5,000, and under the cruise clearance you do not leave an altitude unless you have the necessary VFR minimum." In response to a question from the court, the controller acknowledged: "I don't know he was in VFR. That is something I assumed because he descended." App. at 74-75. He also testified, however, that he was not aware of weather conditions in the area where the plane was descending, and that he asked the pilot what he intended because he was concerned whether the plane was in VFR conditions.[9] Id. at 76-77.
 
 
 46
 The controller knew also that the plane had not reported leaving its cruise clearance altitude of 5,000 feet, although such a report was necessary to cancel its cruise clearance. See Controller's Manual, supra note 4, at P 32. Instead, the pilot stated "just standby with us, and, uh, we'll give you a call here in a minute." The district court found that the plane's failure to report its descent "indicates that its crew anticipated the possibility of not being able to land at Nemacolin Sirport (sic) because of adverse weather conditions." App. at 35, P 60. This finding, which militates against the Government's position, is plainly supported by the record.
 
 
 47
 The Government's air traffic control expert testified that if a pilot "deems it is safe to descend in VFR conditions, we have to assume he is descending in VFR conditions," that the radio transmissions were consistent with a normal descent, and that he would have to assume that the phrase "we are getting some ground contact" meant that the pilot was complying with the regulations and flying in VFR conditions. App. at 259-60, 267. By contrast, appellants' pilot expert and air safety expert both testified that the "ground contact" phrase meant that the plane was not operating in VFR conditions. App. at 106, 212-13.
 
 
 48
 Even accepting the district court's implicit judgment that the Government's expert was more credible than appellants' experts, the evidentiary support for the district court's finding is illusory. The testimony of the Government expert and the controller essentially was that the controller properly assumed that the plane was in VFR conditions because otherwise the pilots would be violating federal regulations.[10] Yet the record clearly shows that except for the fact of descent, everything the controller knew or should have known, including the fact that pilots sometimes disobey regulations, app. at 87, indicated that the plane probably was not in VFR conditions. That the district court's finding is clearly erroneous is critical because a controller has substantially greater responsibilities when a plane is flying under instrument flight rules ("IFR"). Because a pilot cannot fly safely in IFR conditions using visual cues, the controller assumes the primary responsibility for keeping the aircraft at a safe altitude and a safe distance from other aircraft. See Federal Aviation Admin., U.S. Dep't of Transportation, Airman's Information Manual, pt. 1, at 1-62 to -68 (Aug. 1975); Controller's Manual, supra note 4, at PP 254-512.
 
 
 49
 The plane continued to descend for one minute after the controller's inquiry about the pilots' intentions and then flew at 2,600 to 2,700 feet for three minutes. Radar contact continued until the plane crashed into a 2,800 foot ridge, about two hundred feet below its peak. Had the controller issued a low altitude alert, instructing the plane to climb immediately, after his last inquiry to the pilots, this accident could have been prevented. The district court found that the controller knew that area surrounding Nemacolin Airport is mountainous, with peaks of 2,900 feet, app. at 38, P 78, although topographic information is not displayed on a controller's radar screen, id. at 37, P 73. The court found also that the plane's descent was a normal descent, "which did not exhibit any significant or extreme deviations from what an air traffic controller would expect from a plane descending from a cruise clearance to an airport." Id. at 38, P 77. On the basis of these findings, the court concluded:
 
 
 50
 Because the air traffic controller in contact with Charlie Echo was entitled to assume the plane was operating in VFR conditions and, therefore, could see whatever terrain/obstructions were in his path, including mountains in the area, and, furthermore, because the flight path of Charlie Echo did not exhibit any significant or extreme deviations from what would normally be expected, he did not have a duty to issue a low altitude alert at any time during the descent of the plane.
 
 
 51
 App. at 40, P 9.
 
 
 52
 While the district court's finding that the descent was normal is not clearly erroneous, its conclusion that the controller had no duty to issue a low altitude alert is mistaken. The controller was not entitled to assume that the plane was in VFR weather, as I have discussed, and the record shows that the plane was a "radar identified aircraft"[11] whose altitude was displayed on the controller's screen, and that the controller knew the terrain, the height of the peaks, and that the plane was descending. In view of the duty priorities established by the controller's manuals, I cannot conclude, as the majority does, that the controller had no duty to warn under the circumstances. Indeed, I think that the controller would have had a duty to warn even if the Controller's Manual did not require low altitude alerts, because the danger was "reasonably apparent," American Airlines, Inc. v. United States, 418 F.2d 180, 193 (5th Cir. 1969).
 
 
 53
 In sum, the district court misconstrued the controller's duty of care, since the court did not recognize that pilots' and controllers' duties of care are concurrent, and clearly erred in finding that the controller was entitled to assume that the plane was descending in VFR weather. I believe that the controller was negligent because he failed to discharge his duty to issue a low altitude alert to the plane as it descended. The controller had a duty to warn, established by the Controller's Manual, because under the circumstances he was not entitled to assume that the plane's pilot was obeying the visual flight rules.
 
 IV.
 
 54
 My concerns about the majority's disposition of this case transcend my belief that this case is wrongly decided. The standards of conduct for air traffic controllers are high because the safety of air travelers demands it. The degree of care that constitutes reasonable care under the circumstances is a function of the dangers that are fairly apprehended in those circumstances. A few seconds of inattention by a controller always makes possible a tragic, and too often fatal, accident. See Himmler v. United States, supra, 474 F.Supp. at 928. Because the Government, through air traffic control, has undertaken to promote safe air travel, pilots and especially passengers are entitled to rely on controllers' full performance of their exacting duties. See Pierce v. United States, supra, at 621. The FAA added issuing low altitude alerts to air traffic controllers' first priority duties because "(t)he public interest, in light of recent controlled flights into the ground, dictates that we amend our priority of duties to assist pilots in executing their regulatory responsibilities." Federal Aviation Administration Transmission to Area Offices 1 (June 2, 1975) (amending air traffic controllers' manuals), reprinted in app. at 202. That assistance was not given to the pilot here, and the result was tragic for the completely innocent passengers as well as for the apparently negligent pilot.
 
 
 55
 I respectfully dissent.
 
 
 
 [1]
 The flight of general aviation aircraft may be conducted under either one of two different sets of flight rules-visual flight rules (VFR), or instrument flight rules (IFR). Under VFR, a pilot directs his aircraft according to what he can see, navigating from place to place according to visual cues outside his aircraft. Under IFR, it is presumed that pilots are unable to see either other aircraft or the ground and are guided by air traffic controllers. A pilot flying under IFR must file an IFR flight plan, indicating his destination, proposed route of flight and requested altitude. Control of the aircraft is maintained by reference to various instruments on board, and navigation is accomplished through various electronic navigational aids, which receive and interpret data broadcast from ground stations
 
 
 [2]
 The district court applied the general negligence law of Michigan based upon Ohio's conflict of law principles. This is not disputed on appeal and will not be discussed
 
 
 [3]
 The FAA manual requires that such information be solicited when certain weather conditions exist, and it is then passed on to aircraft approaching the area
 
 
 [1]
 I agree with the majority that appellants' contentions about their effort to amend their complaint and certain evidentiary rulings at trial do not warrant reversal
 
 
 [2]
 "(I)n most cases where the trial judge has erred in determining what standard of conduct should have been used in a negligence determination, ... the ultimate finding as to negligence does not pass muster under the 'clearly erroneous' test." Miller v. United States, 587 F.2d 991, 994-95 (9th Cir. 1978)
 
 
 [3]
 Under the Federal Tort Claims Act, the state law that would apply to determine the liability of "a private individual under like circumstances" applies to determine the liability of the Government. 28 U.S.C. § 2674 (1976). The district court held that Ohio's choice of law rules required the application of Michigan's negligence law. App. at 39, P 2. The appellants do not contest this ruling
 
 
 [4]
 FAA regulations permit VFR flight in controlled airspace only if a pilot has forward visibility of at least three miles and can fly at least 500 feet below, 1,000 feet above, and 2,000 feet laterally from any clouds. 14 C.F.R. § 91.105 (1982). Only if VFR conditions are present may plane descend from its assigned cruise clearance altitude toward a destination airport that, like Nemacolin Airport, has no approved instrument approach procedure. Federal Aviation Admin., U. S. Dep't of Transportation, En Route Air Traffic Control, No. 7110.9D, at P 32 (Jan. 1975) (hereinafter cited as "Controller's Manual")
 
 
 [5]
 Although the district court characterized this assertion as a "finding," it is plainly reviewable as a conclusion of law because the scope of an air traffic controller's duty of care is a legal question. Rudelson v. United States, supra, 602 F.2d at 1329
 
 
 [6]
 In this transcript, time is Greenwich Mean Time; "PIT R" is the controller; "847 CE" and "Charlie Echo" are appellants' decedent's plane; and "930" is the army helicopter
 1552:23 PIT R Eight four seven Charlie Echo has
 traffic twelve o'clock, about ten miles,
 northwestbound at six thousand, it's
 a army helicopter.
 1552:33 847 CE Alright sir, uh, how about a five
 thousand cruise clearance here, we'll
 take a look at Nemacolin and, uh,
 let you know.
 ..................................
 1552:40 PIT R Eight four seven echo, you're cleared
 to cruise five thousand.
 1552:43 847 CE Charlie Echo's cleared to cruise five
 thousand.
 1552:46 PIT R Army one five nine three zero, traffic
 twelve o'clock, and about eight miles
 southeastbound, at five thousand, and
 with a cruise clearance for an approach.
 1552:57 930 And, helicopter one five nine three
 zero, no joy, you have us in radar
 contact yet?
 1553:02 PIT R Uh, one five nine three zero, affirmative.
 You're in radar contact five
 miles southeast of Indianhead.
 1553:06 930 Nine three zero, Roger, thank you.
 ..................................
 1553:47 PIT R Army one five nine three zero. The
 traffic is now off your, uh, ten o'clock
 position, about three miles.
 1553:52 930 This is helicopter one five nine three
 zero, Roger. I'm India Mike, uh,
 Charlie, no joy.
 1553:58 PIT R Roger, He's out of fortyone hundred
 now, on a cruise clearance.
 ..................................
 1555:29 PIT R Eight four seven Charlie Echo, what
 are your intentions?
 1555:33 847 CE We just tak'n a look we're getting
 some ground contact here, and I think
 we're gonna make it. But, uh, just
 standby with us, and, uh, we'll give
 you a call here in minute.
 1555:41 PIT R Charlie Echo, Roger.
 1555:45 847 CE (Garble) We're able (garble) get it and
 we miss the contact. I got an eight
 hundred number to call flight service.
 I'll get 'em on the phone thataway.
 1555:52 PIT R Uh, Charlie Echo, say again.
 1555:54 847 CE Yeah, if we, uh, we lose radio contact
 with you and we make the AP, the
 landing OK, I've got an eight hundred
 number to call to cancel it.
 1556:00 PIT R Charlie Echo, Roger, thank you.
 1556:15 PIT R Point out is going to go in to Nemacolin,
 I don't know if he might come
 down around your area or not.
 1556:19 ? Alright, I'll watch him.
 1556:20 PIT R 'K.
 ..................................
 1558:55 PIT R Eight four seven Charlie Echo, radar
 contact is lost.
 App. at 208A-208D.
 
 
 [7]
 The controller testified that the expression "no joy" used by the army helicopter meant that the latter could not see the plane, but that he did not learn until later that the expression "India Mike Charlie" indicated instrument meteorological conditions. App. at 72-73
 
 
 [8]
 The controller had both radar and radio contact with the plane. The data block on his radar screen displayed the plane's assigned altitude of 5,000 feet, its actual altitude, and its precise location in relation to Pittsburgh and Nemacolin airports and the Indian Head, Pennsylvania, VORTAC radio navigation facility. An arrow next to the altitude reading indicated whether the plane was ascending or descending. The data block was revised at ten second intervals by computer
 
 
 [9]
 Appellants contend that the controller was negligent because he did not request a pilot weather report ("PIREP") from the plane. The district court found that the controller had a general duty to solicit PIREPs, but not to solicit them from the pilot of the decedent's plane. App. at 40-41, P 10. I agree with the majority that this finding is not clearly erroneous. Controllers must request PIREPs when current or forecast weather conditions include ceilings at or below 5,000 feet, visibility of no more than five miles, thunderstorms, turbulence, or icing. Controller's Manual, supra note 4, at P 81(a). The Controller's Manual does not require, however, that a controller ask for weather information from every pilot, as appellants' expert conceded at trial, app. at 227. Consequently the controller was not negligent for failing to solicit PIREPs from any particular pilot
 I note that the controller in this case did not request PIREPs from any aircraft even though some of the listed weather conditions were present. That failure, however, whether or not negligent, was not shown to be causally linked to the crash of the plane.
 
 
 [10]
 The Government's expert testified that the Controller's Manual "tells us that controllers are expected to believe the pilots comply with the regulations," app. at 259, but the only provision he could cite states only that pilots are required to obey the rules. His interpretation of this passage was that controllers were entitled to assume adherence. App. at 263, 264. As a matter of law, however, controllers' and pilots' duties of reasonable care are concurrent. See page 2 supra
 
 
 [11]
 "Radar identified aircraft" are all aircraft for which signals are displayed on a controller's radar screen. See Controller's Manual, supra note 4, at P 32