**Marilyn Lee WORTHINGTON, individually and as Personal Representative of the Estate of Frank Smoot Worthington, III, Deceased, and as the duly appointed Executrix of the Estate of Frank Smoot Worthington, III, and as mother and natural guardian of Frank S. Worthington, IV and Matthew Miles Worthington, minors, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. CV 291–12.**

United States District Court, Southern District of Georgia, Brunswick Division.

Dec. 1, 1992.

David Whitworth, Brunswick, GA, Robert Parks and William Petros, Miami, FL, for plaintiff.

Wendy Rome, U.S. Dept. of Justice, Tort Branch, Civil Div., Washington, DC, Mark M. Baylen, U.S. Dept. of Transp. Federal Aviation Admin., Litigation Div., Washington, DC, for defendant.

## MEMORANDUM

NANGLE, District Judge.

Plaintiff brings this action to recover damages for the alleged wrongful death of her husband, Frank "Chip" Worthington, the pilot of a Piper PA–28–181 aircraft involved in a fatal crash on November 13, 1988, at Jacksonville International Airport (JAX) at approximately 8:53:27 p.m. (0153:27 UTC). Worthington was flying three passengers to Jacksonville in time to catch their connecting flight to Tampa, Florida. Unfortunately, the aircraft entered fog during the landing process and, soon thereafter, Worthington lost control of the aircraft and crashed into trees a short distance from the runway.

It is alleged that the air traffic controllers on duty the night of the crash (1) failed to provide timely and accurate weather information to Worthington; (2) failed to timely vector the aircraft onto the runway for its subsequent approach; and (3) failed to timely transfer Worthington from approach control to local control. These factors, considered collectively, are said to have caused Worthington to become spatially disoriented and lose control of the aircraft at a time when his work load was at intense levels. The government, on behalf of the air traffic controllers involved, denies all liability.

This Federal Tort Claims Act case was tried before the Court sitting without a jury. Having considered the pleadings, the testimony of the witnesses, the exhibits [1]

---

1. The Court has viewed a plethora of documents admitted into evidence as well as transcripts of the communications between the air traffic controllers and various pilots on the night of the accident. The Court also heard, during trial, recordings of the actual communications made by the air traffic controllers and the pilots. Finally, the Court was able to view a complete replica of the glidescope Worthington flew on his approach into runway seven.

before the Court and the stipulations of the parties, and being fully advised in the premises, the Court makes the following findings of fact and conclusions of law. Fed.R.Civ.P. 52.

### Statement of Uncontested Facts

Prior to trial the parties stipulated to the following facts (which were adopted by the Court):

1. Mr. Worthington was conducting his flight pursuant to 14 C.F.R. Sec. 135.1 *et seq.* (Part 135).

2. Mr. Worthington was the pilot in command of the accident flight.

3. On November 13, 1988, Chip Worthington held the following licenses and ratings: (1) private pilot, airplane, single-engine land; (2) airplane, multi-engine land; (3) instrument; and (4) commercial pilot. Thus, Mr. Worthington was qualified and authorized to fly single-engine and multi-engine fixed-wing aircraft under instrument flight rules (IFR), assuming all other requirements of the Federal Aviation Regulations (FARs) concerning his flight activities were met.

4. Mr. Worthington was a commercial instrument-rated pilot with almost 1600 hours of flying time, of which 1094 were flown in multi-engine aircraft and 486 in single-engine aircraft. On the eve of the crash, Mr. Worthington was acting in his capacity as a professional pilot paid by TAJ Aviation to deliver three passengers to JAX in time for them to catch their commercial flight to Tampa that evening. Mr. Worthington had been flying for TAJ Aviation for six weeks at that time.

5. Prior to the accident flight, Mr. Worthington had accumulated approximately 264 hours of night flying time and 302 hours of instrument flying time.

6. In his experience as a pilot, Mr. Worthington had flown into JAX on numerous occasions. He had also flown the ILS approach to runway seven at JAX. He was familiar not only with the airport and the ILS approach, but also with the fog conditions that frequented JAX and south Georgia where he was based.

7. At the time of the accident, Mr. Worthington was flying a Piper Archer, model PA 28–181, registration no. N8342L. The Archer is a single-engine, four seat aircraft with a low-wing configuration.

8. N8342L was equipped with the instruments and radios required by the FARs for instrument flight. These instruments included an altitude indicator, a rate of climb indicator, a heading indicator, an altimeter, a gyroscopic turn coordinator, an ILS receiver and two radios designed for direct voice communication with various types of ground facilities as well as other aircraft. The parties dispute whether the gyroscopic turn coordinator was operative on the accident flight.

9. The aircraft was owned by TAJ Aviation, a company that operated out of Brunswick, Georgia.

10. On the night of the accident, Mr. Worthington was directed to fly the aircraft from Brunswick to St. Simons Island, Georgia, take on his three passengers who were golf pros, and fly them to Jacksonville, Florida. The passengers were Davis Love, Jr., Jimmy Hodges, IV, and John Popa who were on their way to a Golf Digest meeting being held the following morning in the Tampa Area.

11. The accident flight commenced at approximately 2023 local time. It is believed that the accident flight was scheduled to arrive in Jacksonville in time for the departure of Piedmont flight 1535 at 9:30 p.m. (2130). It was Davis Love's custom and practice to fly with Piedmont Airlines and that was the only scheduled airline flight from JAX to Tampa after 2023 local time that evening.

12. The entire flight was conducted at night in the dark. Mr. Worthington arose early the morning of the accident flight and his only other flight that day occurred in the morning and lasted two hours.

13. Being a commercial flight, the accident flight was required to be conducted in accordance with all applicable regulations contained in 14 C.F.R. Parts 91 and 135. These regulations require that a pre-flight review be performed. In the review, the pilot must familiarize himself with all available information concerning the flight.

Where the flight is an instrument flight, this information includes weather reports and forecasts and alternatives available if the planned flight could not be completed.

14. At the time the aircraft departed St. Simons Island, at approximately 2023, JAX visibility was below VFR minimums, i.e. a pilot attempting to land at JAX in these conditions normally would be required to execute an instrument approach.

15. At 2031:13, Mr. Worthington contacted Jacksonville Approach, the position worked by Ronald Singletary. Singletary informed Worthington, at approximately 2031:48, "we're landing on runway seven, the weather is sky partially obscured, visibility one mile, fog, wind calm, altimeter is three zero one eight."

16. At 2037:34, Singletary broadcast on the frequency: "Attention all aircraft; tower visibility one half mile."

17. Mr. Singletary issued information that visibility was one quarter mile separately to three different aircraft between 2037:44 and 2037:55. He did not issue this information to Worthington.

18. At 2038:28, Mr. Worthington called the approach controller asking, ". . . uh can we get an IFR in there sir?"

19. At 2039:20, the approach controller told Worthington to "continue your present heading, you're cleared to JAX International via radar vectors, maintain two thousand, expect ILS [instrument landing system] approach [for runway] seven."

20. The pilot of American 1367 requested the RVR from the approach controller at 2038:06 and was told, "right now, the RVR is showing more than six thousand."

21. At 2048:24, the approach controller cleared N8342L for the ILS approach to runway seven at JAX and stated that the aircraft was two and one half miles from the outer marker.

22. Pursuant to FAA order 7110.65E, the Air Traffic Control handbook, a controller should vector an aircraft so as to permit the pilot to intercept the final approach course at least three miles outside the outer marker.

23. Worthington responded to the frequency change with "Eighteen three, sorry about that."

24. The Air Traffic Control handbook provides that frequency changes should occur prior to the aircraft passing the outer marker. Worthington was inside the outer marker when he received the frequency change.

25. Worthington reported on the local tower frequency at 2051:53.

26. At 2051:56, Mr. Stump, the local controller, told Worthington, "Cherokee eight three four two lima, roger, runway seven cleared to land, the uh visib— . . . er uh stand by, the RVR is in update, however, it's been down around two thousand feet or so."

27. At 2052:08, the local controller informed Worthington, "A couple of them have missed the approach and Ameri—an er American jet landed, advised he broke out just about right at minimums."

*Introduction to Key Terms and Duties*

1. IFR, or instrument flight rules, represent one of the two different sets of flight rules under which a flight may be conducted. Under IFR, it is presumed that pilots cannot see other aircraft or the ground and are guided by air traffic controllers. A pilot using this must file an IFR flight plan indicating his destination, proposed route of flight and requested altitude. Control of the aircraft is maintained by various instruments on board, and navigation is accomplished through various navigational aids which receive and broadcast data from ground stations. This kind of a flight uses an ILS, or instrument landing system.

2. Flying pursuant to an IFR flight plan allows pilots to fly in clouds without reference to the ground. Under it, pilots may customarily continue their flight in deteriorating weather conditions. However, when under an IFR flight plan and in the process of landing, a pilot is required to execute a missed approach if, upon reaching his decision height,[2] he does not sufficiently have the runway in sight to make a safe landing.

**2.** The decision height is the minimum height below which a pilot may not proceed unless one

of several items within the runway environment

3. VFR, or visual flight rules, represent the other set of flight rules. Under a VFR plan, a pilot directs his aircraft according to what he can see, navigating from place to place according to visual cues outside his aircraft.

4. Worthington began his ill-fated flight in VFR conditions, but, as the weather was rapidly deteriorating, he began his approach into Jacksonville under IFR conditions.

5. Because these two sets of flight rules involve completely different obligations and duties by those involved, the Court will outline the various duties of air traffic controllers and pilots and explain how they work together.

6. The air traffic controller's duties are twofold. His primary duty is to safely separate the aircraft in preparation for landing or take-off. Once this has been accomplished, the air traffic controller may look to his secondary duties, which include the dissemination of weather information. The air traffic controller is governed by the rules and regulations promulgated by the Federal Aviation Administration in the form of the Air Traffic Control Handbook regulations, which are evidence of custom and duty, whereas the pilots are governed by the Federal Aviation Regulations.

7. When the weather is in a deteriorating stage, the air traffic controller's duties multiply. The air traffic controller is obliged to disseminate certain visibility information to the pilots at certain stages. As the weather deteriorates and the visibility decreases, this duty increases.[3] The primary information the air traffic controller must disseminate under these conditions consists of two points: the runway visual range (RVR) and the visibility. These two measures of visibility determine whether a pilot is flying within his minimums and can appropriately land or take-off in an aircraft.

8. The RVR is the measure of visibility in the touchdown zone area; it represents the horizontal distance a pilot will see down the runway from the approach end. It is electronically measured in terms of hundreds of feet, using standard calibrations, by instruments along the runway, approximately a mile from the tower and National Weather Service buildings. These instruments, known as transmissometers, are in update every 15 seconds so as to provide a continuous brief of the sight distance on the runway. The value given has a running one minute average.

9. The RVR—which is a measure of a slant visual range—measures the horizontal visual range based on the sighting of either high intensity runway lights or on the visual contrast with other targets, whichever yields the greater visual range.

10. The transmissometer, which takes this RVR measure, consists of two parts: the light transmitter and the light detector. It determines the percentage of light received based on the amount transmitted. The higher the percentage of light received, the better the visibility.

11. The prevailing visibility is a sight distance typically measured by the National Weather Service, but often measured by air traffic controllers located in the tower as well. When measured, though, it must be by a trained observer. The air traffic controllers in Jacksonville often measured visibility directly from the tower.

12. The measurements by the local tower as compared to the National Weather Service can differ depending on the location of each at the airport. In Jacksonville,

---

is distinctly visible to and identifiable by the pilot throughout the approach landing. At the time of the accident, the required visual references for a flight like Worthington's were defined by 14 C.F.R. § 91.116 to include the approach light system, the threshold, the threshold markings, the runway end identifier lights, the visual approach slope indicator, the touchdown zone or touchdown zone markings, the touchdown zone lights, the runway or runway markings, or the runway lights. If none of these items is distinctly visible and identifiable at decision height, the pilot is required to execute a missed approach. It is important to remember that what a pilot may see at decision height depends on the individual pilot's observations.

**3.** Evidence at trial revealed that air traffic controllers often take up this duty to disseminate the varying weather information even when they were not obliged to do so. Of course, the duties written in the manuals represent but a minimal obligation.

the National Weather Service building is over a mile from the threshold of runway seven[4] and slightly less than a mile from the touchdown zone. The local tower is $1\frac{1}{16}$ mile from the threshold of runway seven and about $\frac{15}{16}$ of a mile from the touchdown zone. Because the measurement is a visible one, the air traffic controllers must obtain pilot reports ("PIREPs") from the pilots in the air concerning the visibility offered them.

13. Essentially, this measured visibility describes the sight distance a pilot would have in the sky before landing or take-off. Because such a large area is measured, the visibility value given may not necessarily represent the entire area. Thus, even where prevailing visibility is measured at one mile, one quadrant could be down to virtually zero visibility.

14. Similar to the RVR measurement, the prevailing visibility is also continually in update. Unlike the RVR, which is directly linked to the air traffic controller's computer, the visibility measured by the National Weather Service comes to the control tower via an electrowriter.

15. Although testimony at trial differed as to where the electrowriter was located within the tower, i.e., whether there was one in the local control area and one on the approach control area or whether there was only one in the approach control area, it is clear that the instrument is monitored by a person in the "data position." Once the new weather information, including visibility, comes to the air traffic controllers via this instrument, it is torn off by the person in the data position. That person then incorporates the information into the computers available to the air traffic controllers for dissemination to the pilots.

16. The data position is not continuously monitored, however, because the person operating it often has other duties. He is alerted to incoming information by a beeping sound made by the electrowriter.

17. Generally, when visibility decreases to one mile or less, the air traffic controller must inform the pilots of the prevailing RVR. When a determination must be made whether to land or take-off, and the RVR and prevailing visibility differ substantially, the RVR visibility measurement takes precedence. RVR visibility is far more critical to a pilot because it is more representative of the visibility that pilots would encounter on final approach and the touchdown zone than visibility observations recorded by the National Weather Service or within the tower.

18. On November 13, 1988, Worthington's minimums for the flight of his aircraft consisted of a RVR of 1800 feet and a visibility of ½ a mile. Even if he was operating under an IFR flight plan, he would be violating the Federal Regulations if he landed the aircraft when *both* of these minimums were not met.

19. Generally, the duties owed by pilots and air traffic controllers are concurrent; both are responsible for the safe conduct of the aircraft and the safety of the passengers.

20. The pilot is ultimately the one in command of his aircraft. He is directly responsible for, and is the final authority as to, the operation of the aircraft. If the pilot disagrees with an air traffic controller's request, he is free to change and act according to his beliefs.

21. Yet, even though it is often said that the pilot has the ultimate and primary responsibility for his aircraft, the air traffic controller is to work in conjunction with the pilot to help ensure a safe flight. Before the pilot may be held legally responsible, he must know the facts which are material to the operation of his plane. This forces the pilot to become aware of all material facts before he undertakes flight, and it also requires the assistance of the air traffic controllers during that flight.

22. The air traffic controller is not only obligated to provide information to the pilot as required by the Air Traffic Control Handbook, but he is also required to provide information not included in the handbook to the extent that he has undertaken to provide such additional information to the pilots. This is especially true in bad weather conditions or where the air traffic

4. Worthington made his final approach on runway seven.

controller is aware that the pilot is inexperienced or in danger.

23. Nevertheless, the air traffic controllers have the benefit of assuming that the pilots will act in accordance with all rules and regulations. An air traffic controller often monitors a pilot's reaction over the frequency to see if additional attention is needed, but the mere fact that a single pilot is flying an aircraft does not warrant additional attention from the controller.

24. Moreover, air traffic controllers expect pilots to maintain their frequencies, an expectation which becomes mandatory during adverse weather conditions in IFR flights. For reasons discussed later, the Court finds that Worthington properly monitored his radio frequencies.

25. Generally, when a pilot is flying into an airport, he deals with two air traffic controllers, the approach controller and the local controller. The approach controller handles all aircraft on their way into the airport and separates them for landing. His duties generally apply to all aircraft that are beyond five miles from the airport.

26. The approach controller in this case, Singletary, was located in a dark "radar room" in the basement of the tower. Although he sees incoming aircraft on his radar, he cannot see outside. He utilizes the information available on his radar to separate the aircraft and sequence arrivals. He works both outgoing and incoming flights, providing the pilots with advisories and handling any overflights.

27. Located in the "radar room" are eight or nine radar scopes, overhead consoles, and a data position. A weather screen provides the approach controller with the updated weather information that he cannot personally see. The RVR readout is within the approach controller's position, but the electrowriter, although near, is within the bounds of the data position.

28. The approach controller transmits on four frequencies simultaneously. During an IFR flight, such as the one Worthington was experiencing at the time he

reached Jacksonville Airport, pilots are expected to maintain their frequencies and can be held to have heard communications made over the frequencies which are not directly related to that pilot. Worthington was on one of Singletary's frequencies and is expected to have heard the transmissions made while on that frequency.

29. The local controller is responsible for handling aircraft within a five mile radius of the airport as well as aircraft on the runway. He generally must ensure that there is a safe runway on which to land and issue landing clearances once the runway is clear. The local controller in this case, Steven Stump, was located in a glass-enclosed area at the top of the control tower.

30. The local controller uses a "BRITE" radar display, which presents a picture of the information contained on the radar scope being used by the approach controller. A blip represents each aircraft on the "BRITE" display, along with alphanumerics information associated with each aircraft including the aircraft's call sign, type, destination, airspeed, and altitude. This represents the ARTCC system.

31. The approach controller generally "hands off" the approaching aircraft to the local controller at least three miles from the DINNS outer marker.[5] This is usually accomplished through the use of data tags that appear on the "BRITE" scope in the local tower.

32. On the night of the accident, however, the alphanumerics portion of the ARTCC system was not working. Because no data tags appeared on the local controller's screen, the approach controller had to coordinate verbally with the local controller for each hand off.

### Findings of Fact

1. At the outset, the Court states that certain factors emphasized by the parties are not material to the final determination of fault. These include whether the gyro-

---

**5.** The DINNS outer marker is approximately five miles from the end of the runway. The approach gate, which begins the final approach course, is one mile west of DINNS. A pilot is required to intercept the final approach course two miles from the approach gate. Thus, the hand-off must occur three miles from DINNS.

scopic turn indicator was operating at the time of the crash; the weight of the aircraft at the time of the crash; [6] particular violations of the Federal Regulations by Worthington regarding the prudence of accepting this night flight with paying passengers in a single-engine aircraft with no co-pilot and continuing the flight under IFR conditions; and the two-minute delay in Worthington's turnover to local control. Likewise, the evidence herein of spatial disorientation is very speculative and questionable. Spatial disorientation is of itself not uncommon and pilots are trained to handle it. However, under the evidence presented, the Court does not credit testimony that Worthington suffered spatial disorientation as claimed by plaintiff.

2. There is no dispute as to Worthington's ability to fly a single-engine aircraft as a commercial pilot under VFR or IFR conditions. In fact, all evidence pointed toward a prior record of care with which Worthington executed his duties as a pilot. Worthington's ability as a pilot necessarily entails a practical knowledge of weather phenomena, including the principles of fog.

3. Acting in his capacity as commercial pilot on the eve of the crash, Worthington prepared to leave Glynco Jetport in Brunswick, Georgia at approximately 1945 for an eight mile flight to St. Simons Island, Georgia, where he anticipated picking up his three passengers. Before he departed, Worthington executed a perfunctory examination of his aircraft and called for a weather report. The information he received was of a kind satisfactory for a pilot of Worthington's capability to continue with his plans of immediate departure.

4. Most probably, the information that Worthington heard at that time was that the weather conditions at JAX consisted of a visibility of five miles, with haze. Depending on the time he called,[7] he could have heard a weather forecast for occasional visibility of two miles with fog in addition to the general forecast of five miles.

5. Defendant's expert Bernard Coogan, assuming that Worthington heard the occasional two mile visibility forecast, testified that this lower visibility, which was below VFR minimums, must be taken as if it was the actual predicted condition. No rules of law support this determination, nor has it been represented as customary practice. Accordingly, given the response of Worthington at the time he obtained his weather report, the Court believes he left in conditions suitable for a VFR flight plan.[8]

6. Moreover, there is no evidence from which this Court can infer that Worthington again called for weather information once he arrived at St. Simons Island. A VFR flight plan was in effect, however,

6. There was limited testimony at trial as to the aircraft being slightly overweight. The National Transportation Safety Board determined that the aircraft was 90 pounds over the maximum allowable limit with a center of gravity .5 of an inch aft of the datum line. Although excessive weight reduces the flight performance in aircraft in almost every respect, including reducing the rate and angle of climb, reducing maneuverability, and having a higher stalling speed and a higher landing speed, no conclusions have been drawn that the weight differential here had anything but a minor effect on the stability and control of the aircraft.

7. The parties debate exactly what weather information Worthington received prior to his journey to Jacksonville. On the night of the accident, there was a weather observation taken in Jacksonville at 1948, which showed weather conditions in Jacksonville around 2000 to be marginal with five miles visibility.

With regard to what terminal forecasts Worthington may have received, the question is harder. Unfortunately, the National Weather Service does not keep records of when pilots obtain weather briefings. Early in the day on November 13, 1988, at 1233, the National Weather Service forecast five miles in haze with occasional visibility limited to two miles with fog after 2000 for the Jacksonville area. This forecast was in effect until 1934, when it was updated to include a five mile visibility in fog range during the period beginning at 2001 and ending at 2200 on the night of the accident. This later forecast, which did not include the occasional two mile visibility, would have probably been available to anyone calling after 1940.

Because there is no evidence relating to the exact time Worthington called the National Weather Service before leaving Brunswick at 1945, the Court cannot determine whether Worthington heard the earlier or later broadcast.

8. This finding is supported by the same expert's testimony that the weather briefer, if giving a forecast of IFR conditions, would ask the requesting pilot if he could go IFR. There is no indication whatsoever that this occurred.

which indicates that Worthington was operating under flight conditions appropriate for such weather.

7. At the time the aircraft departed from St. Simons Island, JAX visibility was one mile, with fog. This placed the conditions at JAX below VFR minimums.

8. Worthington, however, was flying in clear conditions above the fog layer during his approach into JAX. Although fog began to form over the Jacksonville area in the early evening, fog moves in waves and is clear in between waves. Also, it did not become dense at the airport immediately upon forming, as fog forms closer to the coast than inland and only becomes more dense as it moves inland. On the night of the accident, the fog depth ranged from the surface up to 200 to 250 feet, but could have had a total range between 150 to 300 feet based on the various measurements and observations taken. Worthington was flying in the area above this fog layer up until his descent into JAX.

9. Given the mercurial nature of fog, the fog conditions over the airport itself varied. Variations are common over a distance of one mile or less. The fog was denser on the eastern portion of the airport, which included the tower and National Weather Service Building where prevailing visibility was measured. The area surrounding the threshold of runway seven and further west along the approach to that runway had a much greater visibility. Thus all flights were routed onto that runway for ILS approaches.

10. These conditions were typical for the Jacksonville area, as Jacksonville is located in the "fog belt." Thus, pilots as well as air traffic controllers were aware of the nature of fog conditions there and their unpredictability.

11. Upon arrival at JAX, Worthington's first radio contact with JAX air traffic control occurred approximately at 2031:13. At that time Worthington communicated with approach controller Ronald Singletary.

12. Because a pilot is under a duty to monitor his radio, Worthington should have heard all communications made from the point of his first contact, if not those made before.

13. At approximately 2031:38, Worthington contacted JAX approach control and requested a special VFR clearance into the airport. At this time he was approximately 13 miles from the airport and flying at about 2500 feet. This represents Worthington's first acknowledgement of his realization that there was some kind of weather problem.

14. Immediately prior to Worthington's communication, the approach controller gave another aircraft, Seneca 2213N, weather conditions. Although Singletary admitted at trial that the dissemination of weather information was an important part of his duties, at this time he was focusing on sequencing the aircraft for landing. The Seneca aircraft was to be included in the line-up that was eventually to include Worthington. In this initial communication with the Seneca aircraft, the approach controller directed it to expect an ILS approach into runway seven. Weather conditions were then given to the Seneca aircraft as "sky partially obscured, visibility one mile fog, wind calm, altimeter is three zero one eight." It is clear that, given his request for special clearance, Worthington either heard the above communication with the Seneca aircraft or obtained weather information elsewhere.

15. It is likely that Worthington heard the same weather information as early as 2029:42, when Singletary informed U.S. Air 369 that the sky was partially obscured, visibility was one mile fog, the wind was calm, and the altimeter was three zero one eight.

16. The same weather information was then given to Worthington after he requested his special clearance. At approximately 2031:48, Worthington was told that "the weather is sky partially obscured, visibility one mile fog, wind calm, altimeter is three zero one eight." Worthington acknowledged this information at 2032:02.

17. Immediately thereafter, Worthington was directed to fly heading 190 degrees and to enter the control zone from the north. It was confirmed that Worthington was at that point about 13 miles northeast

of the airport and flying at an altitude of 2500 feet.

18. In the meantime, Singletary had chosen the next three aircraft, in the order of their approach, to land on runway seven: the Seneca and a Conquest, which were two small aircraft, and an American Airlines jet. Singletary had not yet decided the fourth in line, although he indicated at trial that the choice was between Worthington and a small Cherokee aircraft.

19. No further communications were made directly to Worthington until approximately 2038:28, whereupon Worthington requested an IFR. This request leads the Court to conclude that Worthington had been monitoring his radio and heard the prior weather information, including the following:

a. A communication with Cherokee N6834J who was attempting to land at Craig Airport[9] in Jacksonville. That airport is located closer to the coast and the weather information given the Cherokee aircraft related that the fog conditions were worsening there. At 2035:23, Singletary communicated to the Cherokee aircraft that Craig weather was "sky partially obscured, visibility one sixteenth fog, wind calm, altimeter is three zero one six." Although relating the weather at Craig, this is the first indication of IFR conditions and fog at 1/16 of a mile in the Jacksonville area.

b. A communication with Cherokee N6834J at approximately 2036:47 that the visibility at JAX was still one mile fog. A pilot of Worthington's training who heard these two communications should conclude that the weather conditions were worsening from the coast inland toward JAX airport.

c. At 2037:34, immediately after receiving a change in visibility from the local controller, Stump, Singletary made a general broadcast to all aircraft that tower visibility was 1/2 of a mile. These general broadcasts are appropriate for the dissemination of weather information and an acknowledgement from the pilot is generally not expected. A pilot properly monitoring his radio would have heard this broadcast.

d. At 2037:41, on the heels of Singletary's general broadcast, Stump communicated to Singletary a correction that the visibility was 1/4 of a mile now. Rather than make a general broadcast, Singletary broadcasted the 1/4 of a mile visibility to the three aircraft that he already had separated for landing. He felt that after already issuing a general broadcast, a more specific broadcast given to those sequenced to land would be appropriate. He broadcasted tower visibility at 1/4 of a mile to Seneca N2213N at 2037:44; to Conquest N886BC at 2037:49; and to American Airlines 1367 at 2037:55.

20. Although the above broadcasts were not made to Worthington directly, based upon the evidence and the practice of pilots with experiences and abilities similar to Worthington, the Court concludes that Worthington was monitoring the frequency of the approach controller. Defendant submitted testimony at trial that the air traffic controllers can assume that their transmissions are heard at all times, even when no acknowledgements are made. Although the pilots must monitor their frequencies, this does not necessarily mean that all transmission will be heard. An air traffic controller cannot have such a luxury, nor can he assume that the transmission was heard just because he observed compliance by the pilot on the radar screen. However, in this case, three specific broadcasts of 1/4 mile visibility were made. Worthington had to hear at least one of them.

21. At 2038:06 Singletary gave a RVR of more than 6000 to the American Airlines pilot. Under the Air Traffic Control Manual, an air traffic controller is required to give pilots the current RVR when the visibility decreases to one mile or less. Here, although visibility had decreased to one mile or less, Singletary failed to give the RVR to anyone but the American Airlines pilot who requested it.

22. Although Singletary acknowledged that he should have given the RVR to the pilots once the visibility reached one mile or less, this failure was not causally related to the accident that night. The information

9. Craig Airport is approximately seven miles from Jacksonville Airport.

was given to the American Airlines pilot, and, as stated above, Worthington should have been monitoring his frequency. Based upon his later transmission seeking an IFR clearance, the Court concludes that Worthington heard the RVR as well as the visibility. Moreover, by the time Worthington was ready to land, the current RVRs had been disseminated a number of times.

23. Thus, Worthington's request at 2038:28 to "get an IFR in there" evidences that he heard the transmissions to the other aircraft and understood the worsening of the weather.

24. His request to proceed IFR was still appropriate although the visibility of 1/4 of a mile was below his personal minimums for flying IFR. By monitoring his frequency and hearing the RVR to be at least 6000, Worthington knew that he was well within his 1800 RVR minimums. Because RVR controls over the visibility, Worthington acted well within the guidelines in attempting his continued landing IFR.

25. Singletary's response to Worthington's request for an IFR, "four two lima I understand that, stand-by, cherokee three four jay, what is your intentions," implies that Worthington could land IFR. The testimony revealed, however, that Singletary's attention was directed to Cherokee 34J at that time because of his belief that the Cherokee was being operated by a student pilot.[10] Radio exchanges between the Cherokee and the approach controller clearly indicate that the Cherokee pilot was inexperienced and in need of help. Worthington, on the other hand, gave no indication that he was in need of similar special attention.

26. Before returning his attention to Worthington, Singletary received a warning from Stump to "be ready for the missed approaches, it's getting real bad." This occurred at 2039:13.

27. At 2039:20, Worthington received clearance from Singletary. He was told to "just continue your present heading, you're cleared to JAX International via radar vectors, maintain two thousand, expect ILS approach seven."

28. Worthington acknowledged this at 2039:28 and stated that he was out of his current 2500 feet for the new 2000 foot clearance.

29. Singletary spent the next few minutes vectoring the three aircraft he set up for separation. Included in his management as number four was Worthington's aircraft at 2043:05. Worthington was directed to turn right heading 260 degrees.

30. At 2044:34 Singletary informed Stump that Worthington would be the next to transfer to local control after the twin Cessna N886BC.

31. Another 1/4 mile tower visibility was broadcast to an Eastern Airlines airplane at 2045:41.

32. At 2046:58, Worthington was directed to turn left heading 180 degrees. At this point Singletary and Stump were working together to safely separate the aircraft and prepare for missed approaches.

33. At 2048:24, Singletary gave Worthington his position and vectored him onto the localizer to prepare for his ILS final approach. At this point, however, Worthington was two and a half miles from the DINNS outer marker. Under the Air Traffic Control Manual, Worthington should have been vectored onto the localizer at least three miles from DINNS.

34. The purpose of this three mile rule is to permit pilots enough time to safely operate the aircraft during the period of increased work load that occurs on final approach. A three mile spread allows the pilot sufficient time to get the aircraft stabilized on the localizer[11] before he reaches the outer margin where the glidescope starts.

---

**10.** The added attention given the Cherokee pilot, in addition to separating the other aircraft for landing, was momentarily exhausting Singletary's work load.

**11.** The localizer is the horizontal width of the ILS. The pilot encounters this before reaching the glidescope, the vertical width of the ILS. By turning the pilot onto the localizer that far out, he is given an opportunity to become established on the horizontal part. Then, by the time he intercepts the glidescope, he does not have to worry about staying center between left and right.

35. This technical violation of the rules did not affect Worthington, however, as he responded to the information with an "Okee doke, zero nine zero, cleared for the ILS ah four two lima." This calm response, as heard by the Court on the communications tape, indicates that whatever the lateness of his vector did to increase his work load had no adverse effect on Worthington's handling of his plane thereafter. Worthington was able to get established on the localizer right at the outer marker and he flew the glidescope properly.

36. At 2048:35, Singletary again communicated with Stump to inform him that Worthington was two miles outside the DINNS marker. Although it appears that Singletary intended to transfer Worthington to Stump at this time, he apparently forgot to do so.

37. While Worthington was still on the approach control frequency, however, the Cherokee N6834J pilot was still trying to get a special VFR into the Craig airport. Although Singletary initially said that the pilot could give it a try, he later told the pilot to disregard that because Craig had 1/16 of a mile visibility. This Cherokee aircraft was permitted to land with a special VFR into the JAX airport, though, which permission was given at approximately 2050:52.[12]

38. At 2051:36 another aircraft, Guard 60080, reported over the frequency that he had missed his approach and was heading back up to 2000 feet. It is not clear whether this missed approach occurred on runway seven or another runway. Nevertheless, it provided warning over the frequency that the weather was poor enough to cause a missed approach. Worthington was still on the approach control frequency at this time.

39. It was not until 2051:41 that local controller Stump told Singletary to "try four two lima again." Stump was attempting to remind Singletary that Worthington was still on his frequency and needed to be turned over to local control.

40. At 2051:43, Singletary directed Worthington to transfer to the tower frequency. Although the transfer was late, Worthington's response, "eighteen three, sorry about that," indicates that he realized the transfer was late and seemed to take the blame. Worthington transferred to the local control frequency within eight seconds.

41. Plaintiff argues that the transfer of Worthington was untimely and, as a result, deprived Worthington of the benefit of several critical tower frequency transmissions relative to the status of the worsening surface weather conditions. If Worthington had been properly transferred, he would have heard communications on the local control frequency beginning at approximately 2050:00. Instead, his transfer did not take effect until 2051:53, when Worthington communicated with local control that he was now on the frequency.

42. Before and within that time frame, the air traffic controllers had knowledge of missed approaches and informed landing aircraft of the problem. Local controller Stump also had knowledge that the fog was around the decision height of at least two airplanes. The communications were as follows:

a. At approximately 2039:01, Stump was informed by U.S. Air 369 that the fog was at its decision height on runway 13.

b. At approximately 2043:00, Stump cleared Seneca 2213N to land ILS on runway 7 and gave the latest visibility of 1/4 mile, touchdown RVR of 5000, midpoint RVR of 2200 and rollout RVR of 2400. Apparently, the Seneca missed its approach, because around 2044:57 it reported that it was "on a miss uh we didn't get the glidescope that time." No indication was

---

**12.** Singletary testified that at the time he allowed this clearance he did not think that the 1/2 mile and quarter mile visibility was the official ground visibility. As with his subsequent knowledge that he erred in failing to give the RVRs, Singletary admitted that he has since learned that he was in error here too. Although Singletary had a serious misunderstanding of his duties as an air traffic controller, the Court cannot find that his actions were in any way causally related to the crash. Even though this special VFR clearance was broadcast, and probably heard by Worthington, Worthington still knew that the conditions were serious enough to request an IFR clearance.

given that this was due to the weather, however.

c. When American Airlines 1367 was cleared to land at approximately 2045:42, the pilot was told that the wind was calm and the RVR at touchdown was 2600. The RVRs at midpoint and rollout were given as 1400. The pilot was also told that one ahead of him just missed his approach. Immediately thereafter Conquest 886BC was given the same weather information.

d. The conversation between local control and approach control at approximately 2046:21 indicates that the air traffic controllers knew the weather conditions were worsening and were in fact preparing for the foreseeable missed approaches. At this time they discussed what to do with the American Airlines plane if it missed its approach.

e. At 2047:47, the American Airlines plane reported that it was on the ground. The pilot gave some indication of the weather conditions when he was questioned whether he had cleared the runway at 2048:43. He responded that he was not quite clear but he made it to the red lights which he guessed led to the last right turn.

f. Once the American Airlines plane was clear, Stump contacted the Conquest 886BC plane only to find that the plane missed its approach. This occurred between 2048:58 and 2049:55. Around 2050:01, about the time that Worthington should have been transferred, Stump contacted Singletary to inform him that the Conquest flight missed its approach.

g. If Worthington had been turned over at the time plaintiff deems proper, he would have heard Stump obtain a PIREP from the Conquest pilot at approximately 2050:19. Stump was seeking a "tops" report so that he would know at what altitude pilots taking off would get out of the fog. When he asked the pilot his altitude at the time he got out of the fog, the Conquest pilot responded at 2050:26 that he got out of the fog at "about 250 feet."

h. At 2050:41, the American Airlines pilot interrupted and commented, "yeah, that stuff was real thin but it's sitting right at CAT II minimums. I'd say we hit it maybe eight forty feet above CAT II." [13]

i. Even Stump could not see the American Airlines pilot in the fog, as indicated at 2050:55. When he told the American Air-

---

13. There was a major argument at trial as to what this information meant. The government contends that the American Airlines pilot was interrupting a "tops" report and, thus, was trying to give information concerning a definable top to the layer of cloud cover. Not only does the government look to the context in which this comment was made, it also bases its interpretation on the statement that the "stuff" was real thin and that the pilot "hit it . . . eight forty feet above Cat II."

Plaintiff instead interpreted the words "sitting right at" to mean that the bottom of the fog layer, or the "ceiling" of the fog, was "sitting" at CAT II minimums, or 100 feet. This would be consistent with the later weather report that gave a ceiling of 100 feet. The government believes that a finding that the American Airlines pilot was giving a ceiling rather than a tops report is inconsistent with the fact that fog by definition reaches the ground or within fifty feet of the ground. Needless to say, the comment by the American Airlines pilot is confusing at best.

The American Airlines pilot could have been giving both a tops and a ceiling report. He said that he "hit it" at some distance above his minimums. Again, it is unclear what the American Airlines pilot meant by "eight forty feet." Two possible conclusions were brought out at trial:

(1) that the pilot "hit it" forty or eighty feet above his minimums, or (2) that he "hit it" 840 feet above his minimums. Either way, the statement could be interpreted as a tops report. Then, the fact that he stated that it was "sitting right at CAT II minimums" could mean that the bottom of the fog layer was at CAT II minimums. It is clear, at least to this extent, plaintiff's interpretation of "sitting at" is accurate: it was the interpretation that the local controller used, as demonstrated by his later report to Worthington that the American Airlines pilot "broke out" at minimums. Because the American Airlines pilot did not execute a missed approach but instead landed, it makes more sense that he would refer to the altitude that he broke out at the bottom of the fog, rather than the top.

Given the variation of fog and the different interpretations that can be given the American Airlines PIREP, the Court cannot find fault in the subsequent dissemination by the local controller, i.e., that "an American jet . . . advised he broke out . . . at minimums." Even if Worthington would have broke out at 100 feet, or CAT II minimums, he still would have encountered the fog at his decision height of 200 feet and nothing said to him could give him any other impression. From his position, he could see the fog; he had to know that he would encounter it.

lines pilot to let him know when he reached the gate because he couldn't "even see where you're at there."

j. The American Airlines pilot laughingly responded at 2050:57 that "we can't either." Seeing some blue lights the pilot noted that he would be at the gate in a few minutes.

k. After he obtained the above PIREPs, Stump broadcast "cherokee four two lima you with me here" at 2051:31 in an attempt to see if Worthington had transferred yet. No response forthcoming, Stump told Singletary at 2051:41 to "try four two lima again."

43. Plaintiff contends that Worthington's failure to hear the actual PIREPs, in conjunction with the minimal report concerning the above missed approaches and weather given to him by Stump once he was on the local control frequency, lulled him into a false sense of security. Prior to the time Worthington would have been on Stump's frequency, Stump was aware that the fog was at one pilot's decision height on runway 13 and that another aircraft, the Seneca, missed an approach on runway seven. Moreover, his communication to Singletary that they should get ready for the missed approaches evidenced that he realized the weather conditions were worsening.

44. Plaintiff argues Stump's inadequate summary of the worsening weather, in addition to the PIREPs and two missed approaches on runway seven that could have been heard by Worthington first hand had he been timely transferred, led Worthington to believe that he would be able to see the runway when he reached decision height.

45. On initial contact with Worthington at 2051:58, Stump relayed that Worthington was cleared to land on runway seven. The weather report was limited, however, because the RVR was in update. Nevertheless, Stump informed Worthington that the RVR has "been down around 2000 feet or so."

46. At 2052:08, Stump relayed the information he received from the American Airlines pilot and his knowledge concerning the prior missed approaches. He stated to Worthington, "a couple of them had missed the approach and an American jet landed, advised he broke out just about right at minimums."

47. Stump failed to convey to Worthington that the above minimums related to the American Airlines pilot were CAT II minimums, not Worthington's minimums. CAT II minimums are at 100 feet, a full 100 feet below Worthington's 200 foot minimum. Although the Court concedes that, in the abstract, this information was important and not relayed in an accurate fashion to Worthington, it does not find the information to be misleading. A pilot hearing about such a PIREP would not automatically assume that the air traffic controller was referring to his minimums. Rather, the natural assumption is to believe that the minimums referred to were the minimums of the reporting pilot.[14] Thus, a pilot with Worthington's experience should have known that the minimums of the American Airlines pilot could have been different from his personal minimums.

48. In fact, the 2052:08 broadcast from Stump to Worthington put him on full alert. Knowing that other planes had executed missed approaches and that an American jet had broke out "just about right at minimums" was enough to tell a capable and experienced pilot, such as Worthington, that he would be facing serious trouble while landing. He acknowledged receiving this information when he was approximately one and one-half miles from the runway and at an altitude of about 500 feet.[15] From that point on, his fate and that of his passengers depended upon his abilities as a pilot. Unfortunately, these failed him at a

---

**14.** Neither party presented evidence of a pattern or practice of what the words "broke out at minimums" referred to, and accordingly, the Court interprets them to mean breaking out at the minimums of the aircraft reporting. The air traffic controller is not responsible for knowing the minimums of each aircraft; that is the responsibility of the individual pilot.

**15.** Worthington acknowledged this information with "okay four two lima, thank ya." This was the last radio transmission received from Worthington.

critical time. All of the second guessing in the world cannot alter this clear fact.

49. Plaintiff further points to the failure of Stump to disseminate the "tops" report obtained by the Conquest aircraft that, upon executing his missed approach, he got out of the fog at about 250 feet. Nor did he convey any "tops" interpretation that might have been given to the American Airlines pilot's statement that the "stuff" was thin and that he "hit it" some distance above minimums. Even if this "tops" information was used primarily to direct pilots who do execute missed approaches [16] so that they could be turned accordingly, it would have nevertheless been helpful to a pilot in Worthington's situation. In fact, it would have been helpful if Stump related that he could not even see the American Airlines pilot once he landed on the runway. If this information had been given to Worthington, it is clear that he would have had a better idea of when he would encounter the fog and what to expect on the runway.

50. Although this information would have been helpful, the Court does not find it to be pertinent. As the pilot, Worthington's own observations were superior to any information he could have obtained from other sources. A pilot in Worthington's position would be expected to know that fog presents a serious restriction to visibility and, knowing his decision height and of missed approaches in precisely the same conditions, he should be ready and able to execute a missed approach if the fog obscured his vision upon reaching decision height. When he reached his decision height, he alone had to decide whether to land or to abort the landing. At that point he had to rely on his visual observation. If he could not see the required visual references, he was obliged to execute a missed approach. He clearly had sufficient notice of the missed approaches of other aircraft at this particular runway to exercise the greatest of caution for the safety of his passengers and himself. Accordingly, the failure of the air traffic controllers to relay the specific "tops" height or even the minimums of the American Airlines jet had no impact on Worthington's flight and cannot be considered a proximate cause of the crash.

51. Plaintiff also finds fault with the failure of both Singletary and Stump to disseminate a special weather observation received in the tower over the JAX National Weather Service electrowriter at 2051:00,[17] approximately two and a half minutes before the crash. That observation established the existence of a measured broken ceiling at 100 feet with a visibility limited to $\frac{1}{16}$ of a mile by fog.

52. Testimony at trial revealed that the data position usually retrieved the information from the electrowriter and disbursed it to the air traffic controllers. The evidence concerning who had the duty to receive this

---

16. Stump testified that he requested the "tops" information only for the purpose of later being able to coordinate with aircraft missing the approach. He did not disseminate the "tops" report he received from the Conquest pilot, because he felt that this information would not be of use to a pilot approaching the runway. The pilot executing a missed approach is coming out of the fog on the other end of the runway. Because the fog was variable and denser on that end of the runway, it was left for dissemination to those pilots executing a missed approach.

No reason is given as to why nothing more was said regarding the American Airlines pilot's report that the "stuff" was thin and that he "hit it" above minimums. If it had been relayed to Worthington, it would have only reinforced that the fog was variable, something which Worthington knew. Moreover, as discussed previously, this part of the communication was confusing, and, without clarification, Stump's final interpretation cannot be found faulty.

17. Apparently, a $\frac{1}{4}$ mile visibility observation was taken by the National Weather Service in its building at 2048. This information was sent via the electrowriter and received in the control tower around 2049. Immediately thereafter, the observer sent a correction that the visibility was $\frac{1}{16}$ of a mile. This report was received on the electrowriter at approximately 2051. The experts testified that the "correction" was probably not really a correction, but a faster way to change the current visibility observation without going through the mechanics of taking another weather observation.

Nonetheless, it is clear that *only* the visibility of $\frac{1}{4}$ mile was changed with this corrected weather report. The air traffic controllers still had at their disposal the 100 foot ceiling information sent over the electrowriter in the original report at 2049. No reason is given why this information was not given to Worthington.

information was scanty at trial. No evidence was submitted concerning the negligence or lack thereof of the person working the data position for not immediately disseminating the information. Both air traffic controllers testified that they did not receive the weather update before the crash.

53. At the time the first weather information came in, which included the ceiling, Stump was in the midst of obtaining PIREPs from the Conquest pilot that missed his approach and the American Airlines pilot. He finished his last discussion with the American Airlines pilot at approximately 2050:57 and checked his frequency at 2051:31 to see if Worthington had been transferred. Thus, once the second weather report came over the electrowriter, Stump was finished obtaining the PIREPs.

54. At the same time, before Worthington was transferred, Singletary was handling the Seneca and Conquest planes that missed their approaches and also communicating with Stump regarding the approach of an Eastern jet.

55. Both air traffic controllers admitted in Court that they were not excessively busy the night of the crash. Even though both controllers were busy separating and clearing aircraft to land, they agreed that they had time to disseminate the information and gave no reason at trial, other than lack of knowledge, for failing to do so.

56. Plaintiff contends that if Worthington was transferred to Stump's frequency at the appropriate time, Stump would have had more time within which to disseminate the information about the broken ceiling and 1/16 mile visibility. This Court finds that such would not have occurred; Stump did not transmit this information to anyone within the time frame before the crash.

57. If Stump or Singletary had disseminated this information to Worthington, it might have made the reference to the American Airlines plane breaking out at minimums clearer. Nevertheless, Worthington was in a position where he knew that the weather conditions were worsen-

ing and expected to see fog during his landing. The information regarding the missed approaches by two aircraft similar to his with only a commercial jet managing to land warned Worthington that, when he began his approach and descent, he would encounter fog and might not be able to see the runway.

58. Given the information over the radio regarding the weather at Craig, the missed approaches of other aircraft and the American Airlines plane breaking out at minimums, Worthington had sufficient information that the weather was bad and deteriorating. He was alerted, at the very outset of his communications with air traffic control, to the fact that parts of the sky were obscured, that fog prevailed and that visibility was down to one mile. He knew, within minutes, that the visibility decreased from the one mile, down to 1/2 of a mile, and finally down to 1/4 of a mile. The impact of the deteriorating conditions were related to him through all of this information before he ever began his final approach.

59. Even without deteriorating weather, a pilot is always trained to prepare to execute a missed approach. Under 14 C.F.R. § 91.116, a pilot is required to execute a missed approach if, upon reaching decision height of 230 feet mean sea level,[18] he did not have the runway environment in sight sufficiently for the execution of a safe landing.

60. Thus, with the weather conditions as they were, and with Worthington's knowledge of the conditions, he should have been prepared to execute a missed approach, if, upon reaching decision height, he could not see the runway. The decision to make a missed approach does not occur only at or above decision height. In fact, the decision is available to the pilot all the way down. Of course, once a pilot reaches the point where he does not have visual reference to the runway, he must not continue further; he must execute a missed approach.

---

**18.** For JAX airport, this represents 200 feet above the runway, for JAX is located 30 feet above mean sea level.

61. Moreover, in these weather conditions, it is better for the pilot to consider early on whether he will be able to land the aircraft. Once he reaches decision height, the actual decision time is very limited. At the most, a decision should be made within three seconds. According to the expert testimony, Worthington was flying for approximately 20 seconds after passing decision height until the aircraft impacted with the trees. Obviously, within this time frame he should have executed a missed approach.

62. Plaintiff submitted evidence tending to show that Worthington was in the process of executing a missed approach when he became spatially disoriented [19] at decision height and flew into the trees where he crashed. In addition to oral expert testimony, plaintiff looked to the NTSB's report regarding the crash. Based upon certain factual findings in the report, plaintiff concludes that Worthington's aircraft was in a flight configuration at impact consistent with the figuration of a plane attempting a missed approach.[20]

63. Supporting plaintiff's conclusion is evidence that the throttle was in the full open position, that the propeller was operating at high RPM, that the wing flaps were retracted, and that the aircraft's pitch and roll bank indicators were near zero.

64. Contrary interpretations of the same evidence were offered by defendant. The mere fact that the throttle was in full open position does not indicate that the aircraft was operating at the increased speed necessary to attempt a missed approach. There was evidence that the aircraft was operating at a speed above that recommended by a manufacturer for a proper landing the entire time plaintiff was on the glidescope. Thus, the high RPM of the propeller is not necessarily indicative of an attempted missed approach.

65. There is further evidence that the nose was in a down position. However, this was at a slight, 5–10 degree, downward angle, which seems to have made little difference, because the general observation by the National Transportation Safety Board was that the aircraft crashed into forty foot trees while it was at an essentially straight and level attitude.

66. Although the Court recognizes these alternative interpretations, it does not necessarily follow that the Court supports defendant's conclusion that Worthington intentionally descended through decision height all the way to the point of impact without fully observing the runway environment. Even plaintiff contends that Worthington would have in all probability successfully landed the aircraft had he not become spatially disoriented at or near decision height. In fact, it is this alleged spatial disorientation which is said to have caused Worthington to deviate from his flight course and turn left into the trees.[21] Had he not deviated, he would have either executed a missed approach without error or he would have landed or crashed the aircraft into the runway, perhaps without fatal damage.

67. Accordingly, the Court deems it unnecessary to its decision herein to determine whether or not Worthington was attempting to execute a missed approach.

68. The spatial disorientation question, on the other hand, is a crucial part of plaintiff's case. Plaintiff reasons that

19. Spatial disorientation, a term used throughout trial, is simply a misunderstanding or confusion as to one's position in space. Its effect is somewhat minor; the person suffering from such disorientation can recover quickly. Vertigo, which is a more accurate description of what is alleged to have occurred here, involves a confusion of the equilibria senses. Because our best sense is sight, pilots rely on what they see in relation to the ground, or in relation to their instruments for controlling the aircraft when they don't have a relation to the ground. Vertigo is a harsher stage than spatial disorientation because, by interfering with one's concept of movement and velocity, it totally incapacitates his senses.

20. The National Transportation Safety Board, in its report, similarly concluded that the aircraft crashed while attempting to execute a missed approach.

21. The aircraft crashed into a densely wooded area approximately 500 feet past the approach end and approximately 1400 feet north of the extended centerline of runway seven. Initial impact was with the tops of the trees approximately 40 feet in height while heading 010 degrees.

Worthington's failed missed approach was caused by spatial disorientation which was secondarily caused by the misinformation and lack of information given to Worthington by the air traffic controllers as discussed herein.

69. In this instance, Worthington penetrated the top of the fog less than ten seconds prior to reaching decision height. His decision height was approximately 200 feet and the tops of the fog were somewhere between 250 and 300 feet mean sea level. Prior to entering the fog, Worthington was flying in clear conditions and had been flying a perfectly controlled precision ILS approach into runway seven.

■ 70. Plaintiff's contentions concerning spatial disorientation include the following:

a. Inadequate information given to Worthington concerning the weather that he could expect to find on his landing. This is alleged to have given Worthington a false impression that he was going to encounter visual conditions at decision height which did not occur.

b. Failure to give Worthington the current weather information of the 100 foot broken ceiling and ¹⁄₁₆ mile visibility, both of which were below Worthington's landing minimums of 200 feet and ½ mile visibility. Plaintiff contends that if such information were given as required, Worthington would have executed a missed approach before he even entered the fog layer. At that point, both the ceiling and the visibility were below his minimums.

c. Turning Worthington onto the outer marker too rapidly and failing to give Worthington more space outside the outer marker to properly line up his approach.

This improper vectoring of the aircraft is alleged to have increased Worthington's workload.

d. A late transfer of Worthington from approach to local control at approximately his decision height. This factor is similarly alleged to have increased Worthington's workload. If he had been transferred earlier, he would have received pertinent weather information via PIREPs and would also have had more time in which to assess his situation before being forced to make a decision concerning a missed approach.

71. Although determined to be a plausible alternative by the expert witnesses,[22] the Court finds this alleged spatial disorientation to be too speculative to base any fault on defendant on this theory. Viewing all of the factors regarding spatial disorientation in their totality, the Court finds that any finding that the deviation of the aircraft was due to Worthington's spatial disorientation caused by an increased work load and false sense of the impending weather is speculative for the following reasons:

a. First of all, spatial disorientation is a common occurrence among pilots, one for which they are trained to be prepared. Although spatial disorientation could occur from the movement of the pilot's head as he looks outside his window for the appropriate visual clues and then back to his instruments, pilots recognize that they must be proficient in landing procedures as well as anticipate the possibility of illusions during approaches in adverse weather conditions. Therefore, they are generally prepared for the traditional illusions that may occur during bad weather and know how to counteract them. This is clearly one of the

---

**22.** Two of plaintiff's expert witnesses, Alan Wilkinson and Dr. Samuel Green, testified that Worthington became spatially disoriented. Bernard Coogan, defendant's main expert witness, testified that spatial disorientation was a possibility, but vertigo, the harsher form of spatial disorientation, was not. He stated, and the Court agrees, that Worthington entered the fog, lost all visual references, and for whatever reason failed to orient himself. Worthington may have experienced disorientation with regard to his direction, but the proof on the issue of vertigo is speculative.

The Court does not find plaintiff's expert testimony to be credible on this issue, and, instead, it credits Coogan's testimony. Plaintiff's experts testified that the movement of Worthington's head up and down while he was trying to see out the window and then readjusting to the instruments caused vertigo. However, at the angle of descent, it is unlikely that Worthington had to use much, if any, head movement to see outside his aircraft. Although entering the fog may have made Worthington look out his window more intensely, his training should have made him aware that any excessive head movement could cause spatial disorientation.

responsibilities of a pilot. Traditionally, reliance is placed on one's instruments.

b. Furthermore, until reaching decision height, Worthington had flown a perfectly controlled precision ILS approach. Thus, the failure to timely vector the aircraft apparently had no effect on Worthington's work load.

c. Similarly, but for missing some pertinent weather information, the failure to timely transfer Worthington to the local controller seemed to have no effect on Worthington's work load. He appeared calm on all communications with both the local and approach controller. In fact, he seemed to think that he was at fault for not being on the local control frequency when he was told to switch. Further, the actual act of transferring could not have added much to his work load: all it takes is a flip of a switch to transfer frequencies.

d. Moreover, once transferred, Worthington still had over two miles to fly before reaching the runway. Although he was transferred at approximately 800 feet, he had adequate time to assess his situation and prepare for the likelihood that he would have to execute a missed approach. As already mentioned, he did not give any indication that he was confused or concerned. With his extensive background and especially with his familiarity with JAX, if he felt in any way threatened by the late switch over he would have informed the controller and received other instructions. There is no specific evidence that he had a mindset to land the plane despite the adverse weather conditions.[23] The Court finds that he acted in a manner evidencing that he was not worried.

e. Thus, as discussed above, the Court is left only with the inadequacy of the weather information as a cause of the spatial disorientation. Even if we assume, arguendo, that Worthington became spatially disoriented as plaintiff contends, the Court concludes that the failure of the air traffic controllers to properly disseminate the current weather information was not the cause of such disorientation.

72. Worthington had available to him pertinent weather information which should have made him aware of the rapidly declining weather conditions. He knew that the prevailing visibility was at the most ¼ of a mile, which is below his minimums. However, he also knew that the current RVRs were around 2000, which was within his minimums. Because RVRs predominate over visibility, he acted properly in continuing his descent to decision height and not turning around or executing a missed approach before entering the fog. Although the air traffic controllers failed to give the latest visibility and the broken ceiling of 100 feet, Worthington had sufficient information to anticipate the need to execute a missed approach.

73. Plaintiff contends that if Worthington had been given the latest information he would have executed a missed approach before he entered the fog. Such a contention would be speculative at best. The ¼ mile visibility was already below Worthington's minimums, but the prevailing RVRs made his descent acceptable. The RVRs remained the same when the visibility decreased to ¹⁄₁₆ of a mile. With no evidence to the contrary, Worthington would have still made a proper decision in attempting to land the aircraft if the new information had been given.

74. The only evidence that might have influenced him is the ceiling of 100 feet. However, Worthington was given information of other aircraft that executed missed approaches and of one aircraft that broke out at its minimums. Although plaintiff claims that this reference to minimums was misleading, the Court does not so find. If Worthington was confused on the matter, he should have indicated so; instead, he calmly acknowledged the information. After all, he was an experienced IFR pilot with many encounters with fog. If he be-

---

**23.** There is a suggestion, however, that Worthington was in a hurry to land the aircraft so that his passengers could meet their connecting flight to Tampa. The passengers had to be at a Golf Digest meeting in Tampa at 10:00 a.m. the next morning. Given the habit of Davis Love to fly with Piedmont Airlines, the natural conclusion is that they were trying to catch the 9:30 p.m. flight out of Jacksonville. By not leaving St. Simons Island until 8:23 p.m., they did not have any time to spare.

lieved the conditions were too harsh, he would not have attempted to land the aircraft.

75. With the weather conditions as Worthington knew them to be, he should have been fully prepared to execute a missed approach if necessary. He should have been geared to focus on what he could see at decision height, knowing that what he could see outside his window at decision height would be more reliable than what he thought he might see or what he had been told just a few minutes earlier. A pilot must rely on the information he can visually see at his decision height, executing a missed approach when the conditions so require.

76. What happened when Worthington actually entered into the fog is debatable. Did he fail to see the runway and attempt to land nevertheless? The Court is without sufficient information to make a reasoned determination. However, plaintiff has failed to carry her burden of proving that the cause was that of the air traffic controllers Singletary or Stump. The pilot has ultimate and final control of the aircraft. At 2053:01, Worthington was still at decision height. The crash occurred at 2053:27. The proximate cause of the crash was Worthington's failure to properly control the aircraft.

77. The Court is left with the bleak picture of a pilot who, after flying a perfectly lined approach, entered fog at his decision height and was unable to see the runway system. He then attempted to execute either a missed approach or a safe landing. Instead, his aircraft veered to the left into trees and crashed killing Worthington and his three passengers.

### Conclusions of Law

1. This Court has jurisdiction over this action pursuant to the Federal Tort Claims Act (FTCA), 28 U.S.C. § 1346(b), 2671, *et seq.*

2. Venue in this district is proper. 28 U.S.C. § 1402(b).

3. Under the FTCA, the United States may be held liable for personal injury or death caused by the negligent or wrongful act or omission of any employee of the United States acting within the scope of his employment under circumstances where the United States, if a private person, could be responsible to the claimant in accordance with the law of the place where the act or omission occurred. 28 U.S.C. § 1346(b).

4. Under the FTCA, the law of the jurisdiction where the alleged act or omission occurred governs the rights and liabilities of the parties. The negligence alleged in this case took place in Florida. That is where the plane crashed and the air traffic controllers operated. Accordingly, this Court is obliged to look to the law of Florida as the substantive law in this case.

5. Florida applies plain negligence principles to cases involving air plane crashes. Plaintiff must show the existence of three elements: (1) a duty recognized by law requiring defendant to conform to a certain standard of conduct for the protection of others, including plaintiff; (2) defendant's failure to perform that duty; and (3) an injury or damage to plaintiff that was proximately caused by such failure. *Tieder v. Little,* 502 So.2d 923 (Fla.Dist.Ct.App.), *reh'g denied,* 511 So.2d 298 (Fla.1987). These standards are fairly consonant with that of most other common law states.

6. The nature and extent of the duty of due care which air traffic controllers owe pilots and their passengers is a question of law. *Miller v. United States,* 587 F.2d 991, 995 (9th Cir.1978).

7. The duty owed under Florida law is the traditional standard of reasonable care: that degree of care which a reasonably careful person would use under like circumstances. *Sergermeister v. Recreation Corp. of America,* 314 So.2d 626, 627 (Fla.Dist.Ct.App.1975), *cert. denied,* 328 So.2d 844 (Fla.1976).

8. Both the pilot and the air traffic controller owe a duty of care to passengers in an airplane. Because each is responsible for the safe conduct of the aircraft and the safety of its passengers, negligence by the pilot does not, in and of itself, absolve the government from liability. The concurrent duties of the air traffic controller and the

pilot may result in concurrent liability.[24] *Redhead v. United States*, 686 F.2d 178, 182 (3rd Cir.1982).

9. The burden of proving negligence here is on plaintiff, as the party asserting it. *Hart v. Blakemore*, 410 F.2d 218 (5th Cir.1969); *Hensley v. United States*, 728 F.Supp. 716 (S.D.Fla.1989). Plaintiff must prove negligence by a fair preponderance of the evidence. Mere speculation or inference of negligence is not sufficient. *Robinson v. Allstate Insurance Co.*, 367 So.2d 708 (Fla.Dist.Ct.App. 1979).

10. As part of proving that negligence, plaintiff must show that the injury suffered was caused by the alleged wrongful act or omission of the defendant. The negligent act must be the proximate cause of the injury.

11. Proximate cause is a function of law mixed with fact. Florida has followed a "but for" causation-in-fact test which requires a natural, direct and continuous sequence between the negligent act or omission and the plaintiff's injury, so that it can be reasonably said that but for the negligent act or omission the injury would not have occurred. A substantial factor exception to this test occurs when there are two causes that concur to bring about an event in fact, either one of which would have been sufficient to cause the identical result. *Tieder*, 502 So.2d at 925–926.

12. In addition to proving that defendant's actions and inactions constituted the but for cause of a plaintiff's injuries, the plaintiff must also show that the event caused by plaintiff was within the scope of danger created by the defendant's negligence. This additional requirement places a foreseeability aspect on the causation issue. *Id.* at 926.

13. Thus, to establish proximate cause under Florida law, plaintiff must show that a breach of duty by defendant was a "cause in fact" of the injury and also that the accident was a reasonably foreseeable consequence of defendant's negligence.

14. The basic duties of the pilot are defined under the Federal Aviation Regulations (FARs). The air traffic controllers look toward the Air Traffic Control Manual ("Manual") as well as other regulations promulgated by the Federal Aviation Administration.

15. Air traffic controllers have the responsibility to promote the safe, orderly and expeditious flow of air traffic. They may use the guidelines set out in the Manual in performing their functions and in communicating with the pilots, but the Manual is not a FAR and is but a minimal standard of the air traffic controller's duties. It represents evidence of the standard of care of the industry. The Manual is but a guideline to air traffic controllers which provides good operating procedures for controllers to follow. *Kanner v. Ross School of Aviation, Inc.*, 18 Avi. 17,934 (N.D.Okla.1984).

16. Accordingly, an air traffic controller's duties do not stop with the dicta enunciated in the Manual. *See Nakajima v. United States*, 759 F.Supp. 1573 (S.D.Fla. 1991) (extent of government's duty of care does not rest within its own discretion, and government cannot circumscribe its own liability by limiting it to letters of its own regulation, policies, manuals and directors). Thus, once undertaking a responsibility, the air traffic controller must meet the responsibilities set forth in the Manual as

---

**24.** The implication of this conclusion is especially noteworthy here because Florida applies a "pure" comparative negligence rule. That is, if both parties are at fault, the plaintiff can still recover but his recovery is limited to the proportion of damages sustained by plaintiff that were proximately caused by the defendant's negligence. *See Nakajima v. United States*, 759 F.Supp. 1573 (1991) (applying Florida law, court found government comparatively negligent for failing to issue traffic advisories to airplane and helicopter on airplane's fourth pattern prior to collision). The parties here did not base their claims on a comparative negligence theory. In fact, each side alleged that the other was the proximate cause of the crash throughout the trial. Comparative negligence was not mentioned except briefly by plaintiff during the final portion of her closing argument. Given the evidence, the Court finds no basis for assessing comparative negligence on the parties.

well as the additional responsibilities for which the pilots have placed reasonable reliance upon the air traffic controllers for a given service. *Gill v. United States,* 429 F.2d 1072 (5th Cir.1970).

■ 17. Whether or not required by the Manual or other regulations promulgated by the Federal Aviation Administration, an air traffic controller is required to warn of dangers reasonably apparent to him. *Mallen v. United States,* 506 F.Supp. 728 (N.D.Ga.1979).

■ 18. The FARs, unlike the Manual guidelines, have the force and effect of law. *United States v. Schultetus,* 277 F.2d 322 (5th Cir.), *cert. denied,* 364 U.S. 828, 81 S.Ct. 67, 5 L.Ed.2d 56 (1960). They, similarly, prescribe the minimum requirements for safety in the operation of the aircraft, and prudent airmen strive to exceed these minimums to provide themselves a greater margin of safety. *Thibodeaux v. United States,* 14 Avi. 17,653 (E.D.Tex. 1976).

■ 19. One is charged with knowledge of the federal regulations regardless of whether he has received actual notice of the law. *Federal Crop Insurance Corp. v. Merrill,* 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947).

■ 20. Violations of the FARs usually constitute negligence per se. Of course, to constitute negligence per se, the statute violated must have been designed to protect a particular class of persons from their inability to protect themselves, or the statute must be such that it establishes a duty to take precautions to protect a particular class of persons from a particular type of injury. *Florida Freight Terminals v. Cabanas,* 354 So.2d 1222 (Fla.Dist.Ct.App. 1978). Nevertheless, as stated in the findings of fact, the Court can find no actions or inactions performed by Worthington or Stump which, as a matter of law, violate the FARs and therefore constitute negligence per se.

■ 21. Both the Manual and Federal Aviation Administration advisory circulars represent evidence of practices customarily followed by pilots as it relates to standard of care. *Mallen,* 506 F.Supp. at 728.

■ 22. As a whole, both air traffic controllers and pilots are required to do what a reasonably prudent person of their experience and training would have done under the totality of the circumstances. *Kanner,* 18 Avi. at 17,939.

■ 23. Generally speaking, the pilot in command is directly responsible for the operation of the aircraft and has final authority as to its operation. He must be aware of those facts which are material to the proper operation of the aircraft and is charged with that which he should have known in the exercise of the highest degree of care. *Redhead,* 686 F.2d at 182; *see also Spaulding v. United States,* 455 F.2d 222 (9th Cir.1972) (before pilot may be held legally responsible, he must know those facts which are material to operation of his plane).

■ 24. The air traffic controllers can rely on the assumption that a pilot knows and will abide by the applicable FARs as well as the information contained in the Manual and advisory circulars. *Associated Aviation Underwriters,* 462 F.Supp. 674, at 680; *Crossman,* 378 F.Supp. at 1318. Once the pilot has acted accordingly, however, the duties of the air traffic controllers fall into place. They must give warnings as required by the FAA regulations and air traffic control manuals. Although their first priority is the separation of aircraft, weather services fall under a secondary priority as additional services that the air traffic controllers must give. Even though this provision is not mandatory and is performed only as the air traffic controller's other duties permit, the air traffic controller must issue pertinent information on radar-observed weather. Thus, when the dangers are reasonably apparent to him or he undertakes to provide such services, the air traffic controller must fulfill these additional duties with the same due care. *Id.* at 736.

■ 25. The concurrence of the duties of air traffic controllers and pilots is evidenced by the increase in duties experienced by the air traffic controllers in situations where there is general pilot reliance on a given service. Any time the govern-

ment undertakes to furnish to pilots any services additional to those already required by the air traffic controllers, it must exercise due care with respect to such duties. *Mallen,* 506 F.Supp. at 728.

26. The duty of an air traffic controller to disseminate both current weather information and weather forecasts with due care fall under this concurrent relationship between the pilot and the air traffic controller. There is no duty, though, to warn a pilot of things that he ordinarily would know. *Crossman v. United States,* 378 F.Supp. 1312 (D.Ore.1974). Similarly, there is no duty to warn a pilot of a condition that he should already be aware of based on his training, experience and personal observations. *Neff v. United States,* 420 F.2d 115 (D.C.Cir.1969), *cert. denied,* 397 U.S. 1066, 90 S.Ct. 1500, 25 L.Ed.2d 687 (1970).

27. Nor is the air traffic controller bound to repeat information already accurately given. *Redhead,* 686 F.2d at 178; *Spaulding,* 455 F.2d at 222; *Hamilton v. United States,* 497 F.2d 370 (9th Cir.1974).

28. The air traffic controller is not under any obligation to foresee that a pilot may act negligently or unlawfully. *Thibodeaux,* 14 Avi. at 17,659. In fact, only the pilot knows his true capabilities; the controller is not required to make any determination regarding the capabilities of a pilot. *Moorhead v. Mitsubishi Aircraft International, Inc.,* 639 F.Supp. 385 (E.D.Tex. 1986).

29. The pilot in command is still left with the primary and ultimate responsibility for the operation of his aircraft. Although to be issued in a way reasonably designed to insure the safety of the aircraft flight, an air traffic clearance is not an authorization for a pilot to continue his landing when he believes it would interfere with the safety of the aircraft. *Todd v. United States,* 384 F.Supp. 1284 (M.D.Fla. 1975). An air traffic controller cannot order an aircraft to land; the pilot has the final word. *In re Aircrash Disaster at New Orleans (Moisant Field), Louisiana, on March 20, 1969,* 422 F.Supp. 1166 (W.D.Tenn.1975). If he does not fully understand a clearance or considers a clear-

ance unacceptable from a safety standpoint, he must request a clarification or amendment of that clearance. *Barbosa v. United States,* 811 F.2d 1444 (11th Cir. 1987). Case law is replete with situations in which the pilot did not follow the recommendation of the air traffic controller.

30. The pilot's duties with regard to flying in uncertain weather conditions are especially vital. Although the controller, at some distant point, has the duty to aid and assist the crew and furnish whatever information he has that would be helpful, the decisions that depend on conditions known only by the pilot must be made by him. *Redhead,* 686 F.2d at 183.

31. Thus, in uncertain conditions, the pilot must look out for and avoid dangerous weather conditions. He must stay on alert during the course of his flight and listen and give heed to the broadcasts of weather reports that could endanger him or his passengers. His duties include the requisite familiarity with the Airman's Information Manual and FAA advisory circulars. *Mallen,* 506 F.Supp. at 735.

32. The air traffic controller has been held to a higher duty than the pilot in cases where the controller has superior knowledge of weather conditions. This usually occurs in emergency situations or where the controller failed to inform or warn the pilot of a sudden change in the weather. *Redhead,* 686 F.2d at 183; *Martin v. United States,* 586 F.2d 1206 (8th Cir.1978); *Delta Air Lines, Inc. v. United States,* 561 F.2d 381 (1st Cir.1977), *cert. denied,* 434 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed.2d 764 (1978); *Hensley v. United States,* 728 F.Supp. 716 (S.D.Fla.1989) (air traffic controller may be required to provide information not required by air traffic control handbook, but only if extreme danger is reasonably apparent to controller and not apparent, in exercise of due care, to pilot, such that air traffic controller is in superior position to perceive that pilot is in immediate danger); *Deweese v. United States,* 576 F.2d 802 (10th Cir.1978) (negligence of air traffic controller in reading two radar screens at the same time thereby permitting his attention to be diverted from

aircraft involved in emergency to other flights was proximate cause of crash).

33. Where variable conditions exist, the controller is usually in no better position to inform the pilot than the pilot is himself. *See Redhead,* 686 F.2d at 183.

34. Therefore, as the cases infer, when the conditions are such that the pilot is in a better position to see the danger he will face, he is held to his primary duty. When VFR conditions are present, the primary and ultimate responsibility continues to rest on the pilot, for he has the best opportunity to observe what is happening to his aircraft. *Hamilton v. U.S.,* 343 F.Supp. 426 (N.D.Cal.1971). The pilot has the ultimate decision because he knows the condition of the aircraft, its capabilities and must deal with the unusual and unexpected during flight. *Neff,* 420 F.2d at 115.

35. Only when conditions worsen to an IFR stage do the duties of the air traffic controllers emerge from secondary status. In some IFR conditions, where the pilot is not in a better position to see the dangerous condition and the air traffic controller is, the duty falls on the air traffic controller.

36. Nothing the air traffic controllers did here, however, relieved Worthington of his duties and responsibilities. *See Schultetus,* 277 F.2d at 322. Here, concurrent with his duty to remain vigilant throughout his flight to observe the pending weather conditions, Worthington was obligated to look out for and avoid weather conditions to the extent they might become a hazard.

37. A pilot has a continuing duty to be aware of danger that he can see with his own eyes. He cannot ignore weather information he has been given or disregard other conditions which he sees around him. Because a pilot is in the best position to observe the weather in the vicinity of his flight, especially while in the midst of landing his aircraft at decision height, Worthington could not rely on the weather information given by the air traffic controllers if he could not see the runway at decision height. *See Redhead,* 686 F.2d at 178; *Black v. United States,* 441 F.2d 741 (5th Cir.), *cert. denied,* 404 U.S. 913, 92 S.Ct. 233, 30 L.Ed.2d 186 (1971).

38. Duties having been established, the assertions of negligence here must fail because of the absence of causation. Even if the air traffic controllers were found to have violated their duties in disseminating the weather information to Worthington, the Court is still left with the question of the cumulative effect of such failure to disseminate and failure to properly vector and turn over Worthington. The Court finds that the facts presented by plaintiff were insufficient to conclude that any actions of the air traffic controllers were the proximate cause of the crash. Instead, the Court is constrained to find that the actions of Mr. Worthington in operating his aircraft and either executing a failed missed approach or a failed attempt to land were the direct cause of this unfortunate crash. *See Redhead,* 686 F.2d at 182 (if there is negligence on the part of tower personnel or air traffic controllers who are a source of vital information, that negligence must have a causal relationship to the happening of the accident).

39. There is no evidence that the failure of the air traffic controllers to vector Worthington's aircraft and transfer frequencies in a timely manner was a proximate cause of the crash. Worthington proceeded as normal and gave no indication of distress.

40. To the extent that the failure to disseminate pertinent weather information to Worthington may have had a causal effect on Worthington's state of mind, it was superseded by the intervening actions of Worthington. Under Florida law, once a negligent act occurs, the actor will be liable for any injury that flows therefrom, unless an unforeseeable act independently intervenes to cause the loss. *Mitrani v. Druckman,* 576 So.2d 406 (Fla.Dist.Ct.App.1991). In order to be an intervening cause sufficient to break the chain of causation, however, the intervenor's negligence must be truly independent of and not set in motion by the original negligence. *Mann v. Pensacola Concrete Construction Co., Inc.,* 527 So.2d 279 (Fla.Dist.Ct.App.1988).

41. Worthington's actions constituted such an intervening cause. Upon reaching his decision height, Worthington discovered the fog, appreciated the danger

and continued his path. Any contributing effect of the air traffic controllers was displaced by the actions of the pilot when he saw and reacted to the presence of the fog. Nothing the air traffic controllers did at this point would have been of added value to the information that Worthington received at his decision height. At that time, Worthington was in the best position to be informed about the weather conditions, and such information would have stood out in more vivid detail than any that he failed to receive from the air traffic controllers. *See Black,* 441 F.2d at 745 (failure of air traffic controller to warn of the presence of storm in pilot's path cannot be regarded as a continuing proximate cause after the pilot himself discovered its presence and appreciated the danger).

 42. To the extent that plaintiff relies on *Ingham v. Eastern Air Lines, Inc.,* 373 F.2d 227 (2nd Cir.1967), the Court finds it distinguishable. The court in *Ingham* found the air traffic controllers negligent for failing to report a change in visibility from one mile to ¾ of a mile, because it was necessary information which should have been conveyed to the crew as soon as possible. The correct information was known to the air traffic controllers 12 minutes before the crash.

43. To the Eastern flight in *Ingham,* that information was necessary. Unlike Worthington's flight, no RVR information was available to the Eastern crew on the night of their flight so they had to rely solely on the prevailing visibility information given to them by the air traffic controllers. If the RVR had been operative, the Eastern crew would have known that the RVR, the controlling observation, was well below their minimums. Without that information, a change in the prevailing visibility from one mile down 25% to ¾ of a mile would have been important: it brought the existing weather conditions dangerously close to landing minimums. *Ingham,* 373 F.2d at 235.

44. Here, Worthington was given the current RVR, a figure which allowed him to continue his descent. The current visibility was already below his minimums and, unlike the facts in *Ingham,* the facts found herein do not indicate that the change in

visibility from ¼ to ¹⁄₁₆ of a mile and the 100 foot ceiling would have made Worthington maneuver the aircraft differently. He should have already been prepared to execute a missed approach.

45. The crux of the *Ingham* opinion is the deceptive nature of the information given the Eastern crew versus what the actual weather conditions were. The air traffic controllers knew the visibility had decreased to ¾ of a mile and should have known that the one mile visibility information was misleading. The Weather Bureau observer reported a visibility of ¼ of a mile and informed the air traffic controllers that the sky obscuration had increased from two-tenths to eight-tenths. Other pilots reported considerable difficulty in landing and taking off due to the adverse weather conditions and some even had to execute missed approaches. This information was known to the air traffic controllers in *Ingham* and, as such, they should have known that the one mile visibility figure did not truly reflect the conditions that an incoming pilot would encounter.

46. The air traffic controllers directing Worthington did not give any misleading information. Correct information concerning missed approaches and the decreasing weather conditions were relayed to Worthington. The information that was not relayed, the ¹⁄₁₆ mile visibility and the 100 foot ceiling, to the extent that it was known to the air traffic controllers, would not have made Worthington any more able and ready to execute a successful missed approach. In the case at hand, the proximate cause of the crash at 2053:27 was Worthington's failure to operate his plane with the appropriate degree of care at the most critical point in its flight.

### Conclusion

On the basis of the findings of fact and conclusions of law set forth in this memorandum, the Court this date enters judgment in favor of defendant and against plaintiff.